# INTERNATIONAL LADIES' GARMENT WORK-ERS' UNION, AFL–CIO, *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 284.  Argued April 17, 1961.—
Decided June 5, 1961.

*Charles J. Morris* and *Morris P. Glushien* argued the cause for petitioner. With them on the brief were *L. N. D. Wells, Jr.* and *Ruth Weyand.*

*Dominick L. Manoli* argued the cause for the National Labor Relations Board, respondent. With him on the briefs were former *Solicitor General Rankin, Solicitor General Cox, Stuart Rothman, Norton J. Come, Frederick U. Reel* and *Herman M. Levy.*

MR. JUSTICE CLARK delivered the opinion of the Court.

We are asked to decide in this case whether it was an unfair labor practice for both an employer and a union to enter into an agreement under which the employer recognized the union as exclusive bargaining representative of certain of his employees, although in fact only a minority of those employees had authorized the union to represent their interests. The Board found [1] that by extending such recognition, even though done in the good-faith belief that the union had the consent of a majority of employees in the appropriate bargaining unit, the employer interfered with the organizational rights of his employees in violation of § 8 (a)(1) of the National Labor Relations Act and that such recognition also constituted unlawful support to a labor organization in vio-

---

[1] Except for filing an answer, the employer, Bernhard-Altmann Texas Corporation, did not resist enforcement of the Board's order and has not sought review in this Court.

lation of § 8 (a)(2).[2]  In addition, the Board found that the, union violated § 8 (b)(1)(A)[3] by its acceptance of exclusive bargaining authority at a time when in fact it did not have the support of a majority of the employees, and this in spite of its bona fide belief that it did.  Accordingly, the Board ordered the unfair labor practices discontinued and directed the holding of a representation election.  The Court of Appeals, by a divided vote, granted enforcement, 108 U. S. App. D. C. 68, 280 F. 2d 616.  We granted certiorari.  364 U. S. 811.  We agree with the Board and the Court of Appeals that such extension and acceptance of recognition constitute unfair labor practices, and that the remedy provided was appropriate.

In October 1956 the petitioner union initiated an organizational campaign at Bernhard-Altmann Texas Corporation's knitwear manufacturing plant in San Antonio, Texas.  No other labor organization was similarly engaged at that time.  During the course of that campaign, on July 29, 1957, certain of the company's Topping Department employees went on strike in protest against a wage reduction.  That dispute was in no way related to the union campaign, however, and the organizational efforts were continued during the strike.  Some of the

---

[2] Section 8 (a)(1) and (2), insofar as pertinent, provide:

"It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it. . . ."  61 Stat. 140, 29 U. S. C. § 158 (a)(1), (2).

[3] Section 8 (b)(1)(A) provides in pertinent part:

"It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7. . . ."  61 Stat. 141, 29 U. S. C. § 158 (b)(1).

striking employees had signed authorization cards solicited by the union during its drive, and, while the strike was in progress, the union entered upon a course of negotiations with the employer. As a result of those negotiations, held in New York City where the home offices of both were located, on August 30, 1957, the employer and union signed a "memorandum of understanding." . In that memorandum the company recognized the union as exclusive bargaining representative of "all production and shipping employees." The union representative asserted that the union's comparison of the employee authorization cards in its possession with the number of eligible employees representatives of the company furnished it indicated that the union had in fact secured such cards from a majority of employees in the unit. Neither employer nor union made any effort at that time to check the cards in the union's possession against the employee roll, or otherwise, to ascertain with any degree of certainty that the union's assertion, later found by the Board to be erroneous,[4] was founded on fact rather than upon good-faith assumption. The agreement, containing no union security provisions, called for the ending of the strike and for certain improved wages and conditions of employment. It also provided that a "formal agreement containing these terms" would "be promptly drafted . . . and signed by both parties within the next two weeks."

Thereafter, on October 10, 1957, a formal collective bargaining agreement, embodying the terms of the August 30 memorandum, was signed by the parties. The bargaining unit description set out in the formal contract,

---

[4] The Board found that as of August 30 the union in fact had authority to represent either 70 employees out of a relevant total of 280, or 158 out of 368, depending upon the criteria used in determining employee eligibility. "Accordingly, the Union could not, under any circumstances, have represented a majority of the employees involved on August 30, 1957." 122 N. L. R. B. 1289, 1291–1292.

although more specific, conformed to that contained in the prior memorandum. It is not disputed that as of execution of the formal contract the union in fact represented a clear majority of employees in the appropriate unit.[5] In upholding the complaints filed against the employer and union by the General Counsel, the Board decided[6] that the employer's good-faith belief that the union in fact represented a majority of employees in the unit on the critical date of the memorandum of understanding was not a defense, "particularly where, as here, the Company made no effort to check the authorization cards against its payroll records." 122 N. L. R. B. 1289, 1292. Noting that the union was "actively seeking recognition at the time such recognition was granted," and that "the Union was [not] the passive recipient of an unsolicited gift bestowed by the Company," the Board found that the union's execution of the August 30 agreement was a "direct deprivation" of the nonconsenting majority employees' organizational and bargaining rights. At pp. 1292, 1293, note 9. Accordingly, the Board ordered the employer to withhold all recognition from the union and to cease giving effect to agreements entered into with the union;[7] the union was ordered to cease acting as bargaining representative of any of the employees until such time as a Board-conducted election demonstrated its majority status, and to refrain from seeking to enforce the agreements previously entered.

---

[5] The Court of Appeals considered irrelevant the achievement of majority status during the period that the union maintained the unlawful agreement. 280 F. 2d 616, 619, note 3.

[6] Member Fanning agreed with a majority of the Board that the employer violated § 8 (a) (1) and (2), but dissented as to the finding of union violation of § 8 (b) (1) (A). 122 N. L. R. B. 1289, 1297.

[7] However, the terms and conditions of employment fixed by the agreement were not required to be varied or abandoned. We take it that the Board's order restraining the union and employer from dealing will, in any event, terminate after the election is held.

The Court of Appeals found it difficult to "conceive of a clearer restraint on the employees' right of self-organization than for their employer to enter into a collective-bargaining agreement with a minority of the employees." 280 F. 2d, at 619. The court distinguished our decision in *Labor Board* v. *Drivers Local Union No. 639*, 362 U. S. 274, on the ground that there was involved here neither recognitional nor organizational picketing. The court held that the bona fides of the parties was irrelevant except to the extent that it "was arrived at through an adequate effort to determine the true facts of the situation." At p. 622.

At the outset, we reject as without relevance to our decision the fact that, as of the execution date of the formal agreement on October 10, petitioner represented a majority of the employees. As the Court of Appeals indicated, the recognition of the minority union on August 30, 1957, was "a *fait accompli* depriving the majority of the employees of their guaranteed right to choose their own representative." 280 F. 2d, at 621. It is, therefore, of no consequence that petitioner may have acquired by October 10 the necessary majority if, during the interim, it was acting unlawfully. Indeed, such acquisition of majority status itself might indicate that the recognition secured by the August 30 agreement afforded petitioner a deceptive cloak of authority with which to persuasively elicit additional employee support.

Nor does this case directly involve a strike. The strike which occurred was in protest against a wage reduction and had nothing to do with petitioner's quest for recognition. Likewise, no question of picketing is presented. Lastly, the violation which the Board found was the grant by the employer of exclusive representation status to a minority union, as distinguished from an employer's bargaining with a minority union for its members only. Therefore, the exclusive representation provision is the

vice in the agreement, and discussion of "collective bargaining," as distinguished from "exclusive recognition," is pointless.[8]  Moreover, the insistence that we hold the agreement valid and enforceable as to those employees who consented to it must be rejected.  On the facts shown, the agreement must fail in its entirety.  It was obtained under the erroneous claim of majority representation. Perhaps the employer would not have entered into it if he had known the facts.  Quite apart from other conceivable situations, the unlawful genesis of this agreement precludes its partial validity.

In their selection of a bargaining representative, § 9 (a) of the Wagner Act guarantees employees freedom of choice and majority rule.  *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332, 339.  In short, as we said in *Brooks* v. *Labor Board,* 348 U. S. 96, 103, the Act placed "a nonconsenting minority under the bargaining responsibility of an agency selected by a majority of the workers."  Here, however, the reverse has been shown to be the case.  Bernhard-Altmann granted exclusive bargaining status to an agency selected by a minority of its employees, thereby impressing that agent upon the nonconsenting majority. There could be no clearer abridgment of § 7 of the Act, assuring employees the right "to bargain collectively through representatives of their own choosing" or "to refrain from" such activity.[9]  It follows, without need

---

[8] Relying upon reference to § 9 decertification proceedings, petitioner contends that such a contract with a minority union does not prevent employees from exercising complete freedom.  The availability of such a remedy is doubtful in view of the Board's position that the "contract bar" defense prevents a showing of lack of majority status at the time a contract was made.  See *In re Columbia River Salmon & Tuna Packers Assn.,* 91 N. L. R. B. 1424, and cases cited therein.

[9] Section 7 provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through repre-

of further demonstration, that the employer activity found present here violated § 8 (a)(1) of the Act which prohibits employer interference with, and restraint of, employee exercise of § 7 rights. Section 8 (a)(2) of the Act makes it an unfair labor practice for an employer to "contribute . . . support" to a labor organization. The law has long been settled that a grant of exclusive recognition to a minority union constitutes unlawful support in violation of that section, because the union so favored is given "a marked advantage over any other in securing the adherence of employees," *Labor Board* v. *Pennsylvania Greyhound Lines,* 303 U. S. 261, 267. In the Taft-Hartley Law, Congress added § 8 (b)(1)(A) to the Wagner Act, prohibiting, as the Court of Appeals held, "unions from invading the rights of employees under § 7 in a fashion comparable to the activities of employers prohibited under § 8 (a)(1)." 280 F. 2d, at 620. It was the intent of Congress to impose upon unions the same restrictions which the Wagner Act imposed on employers with respect to violations of employee rights.[10]

The petitioner, while taking no issue with the fact of its minority status on the critical date, maintains that both Bernhard-Altmann's and its own good-faith beliefs in petitioner's majority status are a complete defense. To countenance such an excuse would place in permissibly careless employer and union hands the power to completely frustrate employee realization of the premise of

---

sentatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a)(3)." 61 Stat. 140, 29 U. S. C. § 157.

[10] See S. Rep. No. 105, 80th Cong., 1st Sess. 50 (Supp. Views), I Leg. Hist. (1947) 456; II Leg. Hist. (1947) 1199, 1204, 1207.

the Act—that its prohibitions will go far to assure freedom of choice and majority rule in employee selection of representatives.[11] We find nothing in the statutory language prescribing *scienter* as an element of the unfair labor practices here involved. The act made unlawful by § 8 (a)(2) is employer support of a minority union. Here that support is an accomplished fact. More need not be shown, for, even if mistakenly, the employees' rights have been invaded. It follows that prohibited conduct cannot be excused by a showing of good faith.[12]

This conclusion, while giving the employee only the protection assured him by the Act, places no particular hardship on the employer or the union. It merely requires that recognition be withheld until the Board-conducted election results in majority selection of a representative. The Board's order here, as we might infer from the employer's failure to resist its enforcement, would apparently result in similarly slight hardship upon it. We do not share petitioner's apprehension that holding such conduct unlawful will somehow induce a breakdown, or seriously impede the progress of collective bargaining. If an employer takes reasonable steps to verify union claims, themselves advanced only after careful estimate—precisely what Bernhard-Altmann and petitioner failed to do here—he can readily ascertain their validity and obviate a Board election. We fail to see any onerous burden involved in requiring responsible negotiators to be careful, by cross-checking, for example, well-analyzed employer records with union listings or

[11] Although it is of no significance to our holding, we note that there was made no reasonable effort to determine whether in fact petitioner represented a majority of the employees.

[12] See *Labor Board* v. *Perfect Circle Co.*, 162 F. 2d 566; *Labor Board* v. *Illinois Tool Works*, 153 F. 2d 811; *McQuay-Norris Mfg. Co.* v. *Labor Board*, 116 F. 2d 748; and cf. *Labor Board* v. *Industrial Cotton Mills*, 208 F. 2d 87.

authorization cards. Individual and collective employee rights may not be trampled upon merely because it is inconvenient to avoid doing so. Moreover, no penalty is attached to the violation. Assuming that an employer in good faith accepts or rejects a union claim of majority status, the validity of his decision may be tested in an unfair labor practice proceeding.[13] If he is found to have erred in extending or withholding recognition, he is subject only to a remedial order requiring him to conform his conduct to the norms set out in the Act, as was the case here. No further penalty results. We believe the Board's remedial order is the proper one in such cases. *Labor Board* v. *District 50, U. M. W.*, 355 U. S. 453.

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting in part.

I agree that, under the statutory scheme, a minority union does not have the standing to bargain for all employees. That principle of representative government extends only to the majority. But where there is no majority union, I see no reason why the minority union should be disabled from bargaining for the minority of the members who have joined it.[1] Yet the order of the Board, now approved, enjoins petitioner union from acting as the exclusive bargaining representative "of any of the employees," and it enjoins the employer from recog-

---

[13] Section 8 (a) (5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees. . . ." 61 Stat. 141, 29 U. S. C. § 158 (a) (5).

[1] The collective bargaining agreement in the present case undertakes to make the union "the sole and exclusive bargaining representative" for all workers in the bargaining unit. Article II. But the agreement also contains a separability clause—that if "any provision" is held "invalid," the remainder of the agreement is not affected. Article XXIX.

nizing the union as the representative of "any of its employees."

We have indicated over and again that, absent an exclusive agency for bargaining created by a majority of workers, a minority union has standing to bargain for its members. In *Virginian R. Co. v. Federation,* 300 U. S. 515, 549, note 6, the Court quoted with approval a concession that "If the majority of a craft or class has not selected a representative, the carrier is free to make with anyone it pleases and for any group it pleases contracts establishing rates of pay, rules, or working conditions."

That case was under the Railway Labor Act. But it has been followed under the National Labor Relations Act. In *Edison Co. v. Labor Board,* 305 U. S. 197, a union, the Brotherhood of Electrical Workers, was allowed to act as a bargaining representative for the employees who were its members, even though they were a minority. The Court said, ". . . in the absence of such an exclusive agency the employees represented by the Brotherhood, even if they were a minority, clearly had the right to make their own choice." *Id.,* 237. Maintenance of the status of a minority union, until an election was held, might well serve the purpose of protecting commerce "from interruptions and obstructions caused by industrial strife." *Id.,* 237. A decree requiring the employer to cease recognizing the Brotherhood as the exclusive representative of its members was modified:

> "The contracts do not claim for the Brotherhood exclusive representation of the companies' employees but only representation of those who are its members, and the continued operation of the contracts is necessarily subject to the provision of the law by which representatives of the employees for the purpose of collective bargaining can be ascertained in case any question of 'representation' should arise. We construe [the order] as having no more effect

than to provide that there shall be no interference with an exclusive bargaining agency if one other than the [union] should be established in accordance with . . . the Act." *Id.*, 239.

It was in that tradition that we recently sustained the right of a minority union to picket peacefully to compel recognition. *Labor Board* v. *Drivers Local Union*, 362 U. S. 274. There a minority union sought to compel exclusive representation rights. To be sure, this Court recognized in that case that "tension exists between . . . [the] right to form, join or assist labor organizations and [the] right to refrain from doing so." *Id.*, 280. But when a minority union seeks only to represent its own, what provision of the Act deprives it of its right to represent them, where a majority have not selected another union to represent them?

Judge Learned Hand in *Douds* v. *Local 1250*, 173 F. 2d 764, 770, stated that "the right to bargain collectively and the right to strike and induce others to do so, are derived from the common-law; it is only in so far as something in the Act forbids their exercise that their exercise becomes unlawful." In that case a minority union was recognized as having standing in a grievance proceeding outside the collective bargaining agreement, even where a majority had chosen another union. See *American Foundries* v. *Tri-City Council*, 257 U. S. 184.

Honoring a minority union—where no majority union exists or even where the activities of the minority union do not collide with a bargaining agreement—is being respectful of history. Long before the Wagner Act, employers and employees had the right to discuss their problems. In the early days the unions were representatives of a minority of workers.[2] The aim—at least the hope—

---

[2] Twentieth Century Fund, How Collective Bargaining Works (1942), p. 24; U. S. Dept. of Labor Information Bulletin, Vol. 5, No. 6 (1938), pp. 5–8. For examples of such "members only" contracts,

of the legislation was that majority unions would emerge and provide stabilizing influences. Yet I have found nothing in the history of the successive measures, starting with the Wagner Act, that indicates any purpose on the part of Congress to deny a minority union the right to bargain for its members when a majority have not in fact chosen a bargaining representative.[3]

I think the Court is correct insofar as it sets aside the exclusive recognition clause in the contract. I think it is incorrect in setting aside the entire contract. *First,* that agreement secured valuable benefits for the union's members regarding wages and hours, work standards and distribution, discharge and discipline, holidays, vacations, health and welfare fund, and other matters. Since there was no duly selected representative for all the employees authorized in accordance with the Act, it certainly was the right of the employee union members to designate the union or any other appropriate person to make this contract they desired. To hold the contract void as to the union's voluntary members seems to me to go beyond

see, *e. g.,* 2 Lab. Rel. Rep. Man. 964, 967. See also Union Recognition as Shown in Contracts, 1A Lab. Rel. Rep. Man. 781–787: "The beginning point of collective bargaining in labor relations is the recognition by an employer of the other party to any contract entered into as the party representing employees . . . . [U]nion-recognition clauses, as embodied in most recent contracts generally fall into two different patterns. In some contracts, the union is recognized as the exclusive bargaining agent for all employees. In others, the union is recognized as bargaining agent for those employees only who are or may become members of the union."

[3] The Board has frequently recognized that recognition of a minority union as representative of its members only was not an unfair labor practice, absent the choice by a majority of a different bargaining representative. See *Solvay Process Co.,* 5 N. L. R. B. 330, 340; *Hoover Co.,* 90 N. L. R. B. 1614, 1618. And see *Cleveland Worsted Mills Co.,* 43 N. L. R. B. 545; *Black Diamond S. S. Corp.* v. *Labor Board,* 94 F. 2d 875.

the competency of the Board under the Act and to be unsupported by any principle of contract law. Certainly there is no principle of justice or fairness with which I am familiar that requires these employees to be stripped of the benefits they acquired by the good-faith bargaining of their designated agent. Such a deprivation gives no protection to the majority who were not members of the union and arbitrarily takes from the union members their contract rights.

*Second,* the result of today's decision is to enjoin the employer from dealing with the union as the representative of its own members in any manner, whether in relation to grievances or otherwise, until it is certified as a majority union. A case for complete disestablishment of the union cannot be sustained under our decisions. While the power of the Board is broad, it is "not limitless." *Labor Board* v. *Mine Workers,* 355 U. S. 453, 458. Thus a distinction has been taken between remedies in situations where a union has been dominated by the employer and where unions have been assisted but not dominated. *Id.,* 458–459.

The present case is unique. The findings are that both the employer and the union were in "good faith" in believing that the union represented a majority of the workers. Good-faith violations of the Act are nonetheless violations; and the present violation warrants disestablishment of the union as a majority representative. But this good-faith mistake hardly warrants full and complete disestablishment, heretofore reserved for flagrant violations of the Act. Its application here smacks more of a penalty than of a remedial measure.

I think this union is entitled to speak for its members until another union is certified as occupying the bargaining field. That is its common-law right in no way diluted or impaired by the Act.