21 N.Y.2d 541 (1968)
In the Matter of the Civil Service Employees Association, Inc., Respondent,
v.
Robert D. Helsby et al., Constituting the Public Employment Relations Board, et al., Appellants.
Court of Appeals of the State of New York.
Argued February 28, 1968.
Decided March 7, 1968.
Jerome Lefkowitz, Francis J. Higgins, Paul E. Klein, Jerome Thier, Robert J. Miller, Howard Rubenstein and Martin H. Schulman for Public Employment Relations Board, appellant.
Julius Topol for District Council 50, American Federation of State, County and Municipal Employees, AFL-CIO, appellant.
Robert D. Brady for Local 30D, International Union of Operating Engineers, AFL-CIO, appellant.
John R. Harold for Local 223, Industrial Safety Inspectors, appellant.
Robert H. Jones, III, for New York State Nurses' Association, appellant.
Louis S. Zappulla for Safety Officers' Benevolent Association, Inc., appellant.
John T. DeGraff, John Carter Rice, Seth Towse and Samuel Jacobs for respondent.
Judges BURKE, SCILEPPI, BERGAN and JASEN concur with Judge BREITEL; Chief Judge FULD dissents and votes to reverse in an opinion in which Judge KEATING concurs.
*544 BREITEL, J.
This appeal brings before the court for construction the new Public Employees' Fair Employment Act (Civil Service Law, art. 14; L. 1967, ch. 392, also known as the Taylor Act). Involved is whether the Public Employment Relations Board, created by the statute, may promulgate a provisional order directing the State Negotiating Committee, designated by and acting for the Governor, to desist from negotiating with the Civil Service Employees Association on an exclusive basis and to be "neutral" in its treatment of employee organizations which file timely petitions with the Board until that Board resolves the dispute concerning representation status.
In this article 78 (CPLR) proceeding brought by the Association against the Board and various employee organizations petitioning the Board with respect to representation status, Special Term sustained the Board and dismissed the petition. The Appellate Division reversed and held that the Board's order had *545 been issued improvidently and prematurely. It held that there was no evidence that the Negotiating Committee was intending or threatening to act with "exclusivity" in its negotiations with employee representatives or that it was not "neutral." It also suggested that the latter term was of doubtful definiteness in the present context of events.
The order of the Appellate Division sustaining the petition and reversing the judgment at Special Term dismissing the petition should be affirmed. It is concluded that the Board did not have the power to issue the provisional order.
The Association has 101,300 members among State employees and claims to represent them in negotiations with the State government concerning employment conditions. Six of the 39 organizations petitioning before the Board for representation status claim to represent at least some 35,000 State employees with respect to employment conditions. The present record does not disclose the membership of the 6 or the 39 organizations. On November 15, 1967, in response to demands for recognition by the Association, the Negotiating Committee determined that it would negotiate collectively with three units of State employees: professional employees of the State University, members of the State police, and a general unit of all other State employees except members of the militia and those deemed to be management. The Association, in the same determination, was recognized to negotiate on behalf of employees of the general unit for a one-year period. The present issue involves only the general unit. The organizations opposed to the Association resist the establishment of the general unit in which, because of its size and the membership of the Association, the latter would have an overwhelming majority. They contend before the Board that there should be several smaller bargaining units based on the nature of different employments. In such units they would have a fair opportunity to establish their right to represent the employees in collective negotiation with the State. The Board has entertained their petitions and, because it asserts that it cannot resolve the disputes for an extended period, it issued the provisional order to maintain the status quo. Each side points to the time advantages sought by the adversary in expediting or delaying the resolution of the representation dispute.
*546 The Board and the smaller organizations have sought to analogize the new statute to the State and Federal Labor Relations Acts (New York State Labor Relations Act, L. 1937, ch. 443; Labor Management Relations Act, 61 U. S. Stat. 136 [1947], as amd., U. S. Code, tit. 29, § 141 et seq.), under which by judicial interpretation the respective labor boards have the power to issue temporary cease and desist orders pending determination of representation disputes. While it is true that the new statute governing State and municipal employment draws heavily on the statutes regulating private employer-employee relations, the differences between the statutes are marked and undoubtedly reflect the legal and economic differences between public and private employment.
The most notable feature in the new statute is section 204, which reads:
"§ 204. Recognition and certification of employee organizations.
"1. Public employers are hereby empowered to recognize employee organizations for the purpose of negotiating collectively in the determination of, and administration of grievances arising under, the terms and conditions of employment of their public employees as provided in this article, and to negotiate and enter into written agreements with such employee organizations in determining such terms and conditions of employment.
"2. Where an employee organization has been certified or recognized pursuant to the provisions of this article, the appropriate public employer shall be, and hereby is, required to negotiate collectively with such employee organization in the determination of, and administration of grievances arising under, the terms and conditions of employment of the public employees as provided in this article, and to negotiate and enter into written agreements with such employee organizations in determining such terms and conditions of employment."
It gives the public employer the power to recognize employee organizations and requires the employer to negotiate with such recognized organizations. There is no similar provision in the Federal and State Labor Relations Acts. The quoted section also contains a similar requirement to negotiate with a certified as distinguished from a recognized organization.
*547 An organization which disputes the representation status of an employer-recognized organization may invoke the procedures of the Board under sections 205 and 207 to obtain Board certification. In that event it may displace the previously employer-recognized organization and the Board, under paragraph (k) of subdivision 5 of section 205, may "exercise such other powers, as may be appropriate to effectuate the purposes and provisions of this article." Presumably, the Board may then issue orders to enforce its determinations, although the statute contains no other direct delegation of such powers (see § 210, subd. 4). But the condition precedent to such orders is the making of a determination by the Board (§ 205, subd. 5, pars. [b], [c]; § 206). In this matter the Board made no determination, except that it required time to resolve the representation dispute and that, in the meantime, the Negotiating Committee was to be restrained in the particulars already described. Nor did the Board follow any of the procedures, including hearings, required by sections 205 and 207 in making determinations.
A significant difference between the State Labor Relations Law and the present statute concerns the presence in the one and absence in the other of provisions relating to unfair labor practices and cease and desist orders (Labor Law, §§ 704, 706, subd. 3). Even the sections providing for judicial enforcement are quite different, the provision in the one being quite broad and in the present statute quite narrow (Labor Law, § 707; Civil Service Law, § 210, subd. 4; § 211).
Consequently, the Board had no power to issue the instant order. The conclusion is mandated by the statutory pattern which gives the public employer the power to recognize an employee organization and requires that it negotiate with it. This departure from the private labor relations statutes is explained, perhaps, by the nature of government operations in this State. Such operations are regulated by annual budgets and appropriations adopted by law-making bodies. Indeed, the negotiating executives probably have no ultimate power to bind the appropriate legislative bodies, although if the provisions of the statute are followed they may enter into written agreements with recognized or certified organizations. (Without the statute, they would presumably not have even that power.)
*548 The critical time elements for public employers, who owe a very special obligation to the public not owed by private employers, are exemplified in this case in that the State's new fiscal year begins April first, and the budget and appropriation bills must be projected and adopted before then. The matters of time, budgets, and appropriations, as well as the special obligations of public employers, may well explain the conferring of power on the public employer to recognize and negotiate with employee organizations, untrammeled by representation dispute proceedings until they have been resolved by the Board through certifications of appropriate bargaining units and employee organizations.
The Appellate Division was quite correct in stating that the Negotiating Committee had not extended explicitly exclusive status to the Association, and, indeed, the public employer is not given such power by section 204. Nor is the public employer given power as such to establish bargaining units (compare § 204 with § 205, subd. 5, par. [f]). True, by extending or withholding recognition and by the designation of bargaining units some of the effects of exclusiveness may be indirectly accomplished. Such indirect but substantial effects, where improper or undesirable, may be corrected by the Board by following its procedures on petitions filed with it pursuant to section 205. But it must follow the procedures and make a determination by providing a resolution of a particular dispute. It may not otherwise interfere with the executive process, under the present statute, without doing as much. While this may leave some sort of gap in the pattern, that is the consequence of the statute's plan, which presumably was intentional. The Board may accomplish its purposes by expedited action instead of stating, as it does, that it requires some indefinite time into the year beyond the budget and appropriation period. Or further legislation should be obtained, assuming that the law-making agencies would allow such interference as the Board has attempted to engage in here.
Accordingly, the order should be affirmed, without costs.
Chief Judge FULD (dissenting).
The procedure now being sanctioned by the court seems to me to offend not only reason and logic but the statute before us as well.
*549 Section 203 of the Public Employees Fair Employment Act (Civil Service Law, art. 14, L. 1967, ch. 392)  popularly known as the Taylor Law  provides that employees "shall have the right to be represented by employee organizations to negotiate collectively with their public employers in the determination of their terms and conditions of employment". The meaning of the section is plain; collective bargaining is to be conducted on behalf of the public employees by an employee organization of their choice.
It was, of course, contemplated that disputes might arise either as to the appropriate bargaining unit or as to whether a particular organization selected by the employer actually does represent the employees and, for this reason, the Legislature created the Public Employment Relations Board as the agency to "resolve," among other matters, "disputes concerning the representation status of employee organizations"  pursuant to procedures it may establish  "upon request of any employee organization" (Civil Service Law, § 205, subd. 5, pars. [a], [b]; also § 205, subd. 5, par. [k]). Moreover, to underscore the Board's power and function, the Legislature further declared (§ 207) that, "[f]or purposes of resolving disputes concerning representation status, * * * the board * * * shall
"1. define the appropriate employer-employee negotiating unit * * * [and]
"2. ascertain the public employees' choice of employee organization as their representative * * * on the basis of dues deduction authorization and other evidences, or, if necessary, by conducting an election."
The court recognizes the existence of these provisions and ascribes to them the same meaning I do. However, it maintains that, despite the employees' insistence that the organization selected by the employer does not represent them, such organization should, nevertheless, be permitted to negotiate collectively with the employer and determine "the terms and conditions of employment" before the Board has had the opportunity to resolve the dispute. Indeed, the majority is holding that this is the procedure to be followed before there is any Board determination  even though the Board may, after conducting a hearing and considering the evidence adduced, reach the conclusion that the bargaining unit designated by the public employer is not the *550 appropriate one or that the employer-selected employee organization does not represent a majority of the employees.
Such a result may be dictated by expediency but to me it seems highly unreasonable and unfair. If the statute empowers the Board  and imposes upon it the duty  to settle controversies concerning bargaining units and the representation status of employee organizations, and no one disputes this, then, the Board must have the power, when a bona fide representation issue is present, to do what is reasonably necessary to preserve its function. In other words, the Board must be able to prevent, by an appropriate provisional order, the public employer and the possibly nonrepresentative organization which it had selected from going forward with negotiations and executing written agreements containing "terms and conditions of employment" (Civil Service Law, § 204, subd. 1). Certainly, the Board was never intended to be a mere rubber stamp.
It is hardly sufficient, in order to protect the rights of the employees, to allow the employer's initial determinations, both as to the appropriate bargaining unit and the organization which represents the employees in that unit, to stand until the Board is able to make its determination. The contract which the State is now seeking to negotiate, the first of its kind in the history of this State, is bound to serve as a precedent and become the starting point for all future negotiations. Even more important, those organizations seeking recognition at this point  to which they may conceivably be entitled  may find it virtually impossible to establish themselves after their rival organization has been allowed to become ensconced with the trappings and privileges of an exclusive bargaining representative for a considerable period of time.
My view is confirmed not only by the language but by the manifest purpose of the legislation. Thus, the Board has been authorized to exercise such powers "as may be appropriate to effectuate the purposes and provisions of this article" (Civil Service Law, § 205, subd. 5, par. [k]). Under this provision, the Board can fashion such remedies which in its judgment are appropriate, and the exercise of its discretion will not be set aside unless its action is arbitrary or the remedies bear no reasonable relationship to the policies of the statute. (See, e.g., Labor Bd. v. Seven-Up Co., 344 U. S. 344, 346; *551 Phelps Dodge Corp. v. Labor Bd., 313 U. S. 177, 194.) The Supreme Court's statement in Phelps Dodge Corp v. Labor Bd. (313 U. S. 177, supra), describing the powers of the National Labor Relations Board is especially apt (p. 194):
"But in the nature of things Congress could not catalogue all the devices and stratagems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations. Congress met these difficulties by leaving the adaptation of means to end to the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review. Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy". (Emphasis supplied.)
Since the Board has not acted arbitrarily, this court has no choice but to approve the remedy it has devised. "[T]he power [of devising remedies], which is a broad discretionary one," the Supreme Court has declared in the Seven-Up Co. case (344 U. S., at p. 346), "is for the Board to wield, not for the courts. In fashioning remedies to undo the effects of violations of the Act, the Board must draw on enlightenment gained from experience."
In addition, the majority's decision herein  which permits an employer to deal exclusively with one of several contending unions while a genuine representation issue is pending before the administrative agency  is in direct conflict with State and national labor policy, premised, as it is, on the right of employees in both private (National Labor Relations Act, § 7 [U. S. Code, tit. 29, § 157]; New York State Labor Relations Act [Labor Law, § 717]) and public sectors (Civil Service Law, § 203) to have free and unfettered choice in the selection of their collective bargaining agents. To protect that fundamental right, in cases where a genuine representation issue is raised, all of the labor organizations involved in the dispute are required to abstain from entering into any collective bargaining agreement with the employer. *552 (See Garment Workers v. Labor Bd., 366 U. S. 731; Midwest Piping & Supply Co., 63 N. L. R. B. 1060; see, also, N. L. R. B. v. Tower Iron Works, 366 F.2d 189; Iowa Beef Packers v. N. L. R. B., 331 F.2d 176.)
The requirement that an employer must maintain strict neutrality in such a situation, articulated by the National Labor Relations Board in the Midwest Piping & Supply Co. case (63 N. L. R. B. 1060, supra), has been applied by the Supreme Court in a situation where the union did not represent a majority of the employees at the time of recognition but did at the time the collective bargaining agreement was executed. The Supreme Court enforced a Board order requiring a union to cease acting as a collective bargaining agent of employees until "such time as a Board-conducted election demonstrated its majority status, and to refrain from seeking to enforce the agreements previously entered." (Garment Workers v. Labor Bd., 366 U. S. 731, 735, supra.) Just as recognition of the minority union and the making of a collective bargaining agreement in the Garment Workers case had the effect of destroying section 7 rights of the employees under the Federal statute, so here the public employer's recognition of the respondent Association and the making of a collective bargaining agreement with it would destroy identical section 203 rights granted by the Taylor Law.
If the Public Employment Relations Board were to make a representation determination, pursuant to section 207 of the Civil Service Law, the court, to protect employee rights guaranteed by section 203, would  after such determination has been made  undoubtedly enforce a Board order requiring the public employer to desist from recognizing or negotiating with an uncertified union. The majority position, however, is that until there is a Board determination no provisional remedy of any kind can be made by the Board to protect section 203 rights. Neither reason nor the statutory powers of the Board support such a distinction. Where an employer, whether he be in the public or private sector, chooses between two unions, it is common belief that the union which the employer has chosen is more likely to prevail. As was stated by Professor Derek C. Bok of Harvard Law School (now its Dean-Designate), "[f]or though Midwest Piping is commonly justified in terms of `free *553 choice' and `coercion,' its strongest appeal is rooted in the desire to be fair to each of the contending unions. Many organizers believe that where it is difficult for the employees to choose between two unions, the union that can obtain a reasonable contract is likely to prevail. This may not imply any lack of rationality on the part of the voters. But it is arguably unfair for one union to lose merely because the employer has chosen to negotiate a contract with the other." (The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv. L. Rev. 38, 119.)
By a parity of reasoning, if respondent Association does not truly represent the public employees, the rights given to the latter by section 203 will be destroyed, regardless of whether the respondent enters into a collective bargaining agreement before or after a Board determination. In either case, where there is a genuine representation issue, the recognition accorded to one of two contending unions and the making of a collective bargaining agreement with such a union will prevent a free and uninfluenced choice of the bargaining agent.
Nor is it of any consequence that the recognition of a labor organization and the making of a collective bargaining agreement with it might be an unfair labor practice under the National Labor Relations Act and the State Labor Relations Act but not under the Taylor Law. The significant point is not that the conduct is or is not an unfair labor practice but that the free choice of the bargaining agent has been interfered with and rights such as those guaranteed by section 7 of the Federal Act and by section 203 of the Taylor Law have been destroyed. Pertinent and important is the statement of the Federal Court of Appeals in N. L. R. B. v. Air Master Corp. (339 F.2d 553, 556): "It is interference with the employees' choice, not frustration of the Board's design to hold an election, which the statute proscribes as an unfair labor practice. And the latter is not necessarily determinative of the former. Indeed, a Board conducted election is merely a means for expressing a free choice." For these reasons, the National Labor Relations Board has time and again set aside elections where the free choice of the bargaining agent was interfered with even though the conduct complained of was not an unfair labor practice. (See, e.g., Allis-Chalmers Mfg. Co. v. N. L. R. B., 261 F.2d 613; see, also, Bok, The Regulation of *554 Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv. L. Rev. 38.)
In sum, if the Board be held powerless to issue the sort of provisional order which it has issued in this case, then, the function of the Board, insofar as it was set up to assure a fair election and a true collective bargaining agreement, may be frustrated and the design of the statute undermined. In point of fact, as I have sought to show, unless the Board has the power to issue such a provisional order, the rights given public employees by section 203 may be violated with impunity. Nor will the rendition of a final Board determination as to the bargaining unit repair the harm done by permitting the organization (selected by the employer) to negotiate and enter into an agreement on behalf of persons it may not actually represent.
I would, therefore, reverse the order of the Appellate Division and reinstate Special Term's order dismissing the petition.
Order affirmed.