NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

PEPSI COLA BOTTLING COMPANY
and Brewery Workers Local
No. 79, Respondents.

No. 71–1397.

United States Court of Appeals,
Sixth Circuit.

Jan. 24, 1972.

William R. Stewart, N. L. R. B., Washington, D. C., Eugene G. Goslee, Acting Gen. Counsel, Peter G. Nash, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Thomas E. Silfen, Howard C. Hay, Attys., N. L. R. B., Washington, D. C., on brief for petitioner.

William P. Hutcheson, Chattanooga, Tenn., for Pepsi Cola Bottling Co.; Humphreys, Hutcheson, Moseley & Clements, Chattanooga, Tenn., of counsel.

Frank J. Tuk, Cincinnati, Ohio, for Brewery Workers Local Union No. 79.

Before WEICK and CELEBREZZE, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

National Labor Relations Board seeks enforcement, and respondents Pepsi Cola Bottling Company and Brewery Workers Local No. 79 ask denial of enforcement, of an order of the Board issued December 7, 1970, and reported at 187 N.L.R.B. No. 3. The Board ordered respondents to cease and desist from giving effect to an agreement made April 28, 1969, which designated the Brewery Workers Local as bargaining agent for the company's employees. The Board's finding, which affirmed its trial examiner, was that on the date of the above bargaining agreement both the company and the Brewery Workers knew that a substantial majority of the company's employees no longer wished to be represented by the Brewery Workers. There was clear evidence that about 25 of the company's 35 employees had, shortly before the date of the challenged contract, signed cards authorizing the Teamsters Union to act as their agent in bargaining with the respondent company.

■ For some years prior to 1969, the Brewery Workers Local had a contract with the company which recognized it as the bargaining agent of the company's employees. This contract was to expire on April 30, 1969. Prior to such date, the company's employees had become dissatisfied with the Brewery Workers and sought to have the Teamsters Union replace them. The company and the Brewery Workers, however, were, for a period of 60 days prior to the expiration of the current contract, insulated against intrusion by the Teamsters seeking to displace the Brewery Workers. Deluxe Metal Furniture Co., 121 N.L.R.B. 995, 1001 (1958); City Cab, Inc., 128 N.L.R.B. 493 (1960). On March 26, 1969, Teamsters filed a petition with the Board's regional office seeking to represent respondent company's employees. This was later withdrawn, however, because of the still existing contract between the company and the Brewery Workers. On April 28, 1969, two days before the expiration of this contract, the company management and representatives of the Brewery Workers, in a single bargaining session, negotiated and signed a new contract continuing the Brewery Workers as bargaining representative of the company's employees. If at that time both the company and the Brewery Workers knew that the latter union did not represent a majority of the company's eligible employees, their entering into such a contract as they did sign would violate the Act. This would be so notwithstanding the 60 day period of insulation above referred to. Kenrich Petrochemicals, Inc., 149 N.L.R.B. 910 (1964); Hart Motor Express, Inc., 164 N.L.R.B. 382, 384 (1967).

The Board affirmed its trial examiner's factual finding that on April 28, 1969, the date of the above contract, both of the contracting parties knew that the Brewery Workers no longer represented a majority of respondent company's employees. This appeal challenges the correctness of this factual finding. The evidence from which it was made is set out at length in the trial examiner's decision. We recite this much of it.

■ On March 11, 1969, in anticipation of the expiration of the existing contract between respondents, a meeting

of the members of the Brewery Workers Local was called. Only five employees showed up. The Local's president—not an employee of respondent company—attended but was in "an advanced state of inebriation." This condition frustrated any meaningful meeting and those of the company's employees who did attend, thereafter pursued efforts to get the company's employees to join ·and choose, as their bargaining agent, a Local of the Truck Drivers and Helpers Union—the Teamsters. Such effort was successful and some 25 of the respondent company's 35 employees signed membership cards, petitions, or other documents evidencing their desire to have the Teamsters represent them. This material was exhibited to the company president, who expressed his desire to continue, nevertheless, to deal with the Brewery Workers. No negotiations with the Brewery Workers looking toward a new contract to replace the one which was to expire on April 30, 1969, had begun at the time it was made known to the company that its employees were dissatisfied with the Brewery Workers. However, at one bargaining session, held on April 28, the company and representatives of the Brewery Workers made a contract extending the Brewery Workers bargaining rights for a period of three years. Only three of the company's employees were present at this meeting.[1] It is fair to conclude that the negotiations leading to this contract were carried on between the company's president, the president of the Brewery Workers Local—not an employee of respondent company—and one Mel Greenthal, a representative of Brewery Workers International. The Constitution of the International Union of the Brewery Workers provided:

> "Ratification of contract shall be by a majority of the votes cast by the members affected by the contract. Said vote shall be by secret ballot at a regular meeting or at a special meeting called for that purpose."

No such ratification procedure was had. The International Constitution also provided, however:

> "[I]n unusual circumstances, the General Executive Board may vary or dispense with this procedure."

The respondent company's president testified that Greenthal, the International representative, said he "was empowered to ratify the contract for· the International Union." Greenthal did not testify, however, and there is no evidence that the General Executive Board did in fact dispense with membership ratification. It could be fairly inferred that the only "unusual circumstances" present consisted of the desire of the company and the Brewery Workers to frustrate the wishes of the company's employees to have the Teamsters as their bargaining representatives.

Respondents' address to us constitutes, primarily, a challenge to the substantiality of the evidence upon which the trial examiner, affirmed by the Board, made the critical findings of fact. In the company's brief they set out as the principal issue the following:

> "Whether substantial evidence on the record as a whole supports the Board's finding that at the time the Company and the Brewery Workers signed a collective bargaining agreement the parties knew that the Brewery Workers did not represent a majority of the Company's employees?"

Respondents argue that because the Teamsters had withdrawn their petition for a representation election, they were justified in assuming that the Teamsters had lost interest in respondent company's employees. The trial examiner discussed this and other contentions in this manner:

> "However, Respondent Employer claims that even assuming that it was placed on notice by March 20 of the majority status of the Teamsters (by the March 19 letter of Business Agent Test), the effect of such notice was

---

1. These employees were not the same men who were chosen at the March 11 meet-ing as members of the bargaining committee.

effectively dissipated on or about April 3 when it received the notification from the Board's Regional Director that the petition filed by the Teamsters for an election had been withdrawn. However, the Teamsters never notified Respondent Employer that Teamsters was receding from the position taken in the March 19 letter to the Respondent Employer, and counsel for Respondent Employer candidly acknowledged at the hearing that he was aware that the Teamsters had withdrawn its petition not because of a lack of interest in the employees, but because the petition was untimely filed. Under these circumstances. I cannot give credence to the testimony of McDade that he equated the withdrawal of the Teamsters petition with an abandonment of Teamsters interest in representing the employees. Rather, McDade proceeded to negotiate with the Respondent Union upon his attorney's assurances that such negotiations were legal and proper because they took place within the 'insulated period' provided in *Deluxe Metal* and *City Cab*. However, as hereinabove discussed, I have found these cases not to be controlling of the situation here.

"As respects notice to the Respondent Union, there is no record evidence that a copy of the petition which was sent by the Teamsters to the Company was ever sent to the Respondent Union. However, there is testimony of employee Gene Harrison that approximately a week prior to the execution of the collective-bargaining agreement at issue here, he telephoned president of Respondent Union, Rocky Layne, and told him that approximately 90 percent of the employees would like to see execution of the contract delayed until the first week of May since 'there was a possibility we could put the Teamsters in.' However, Layne rejected this suggestion and advised Harrison that there would be a contract negotiated. Moreover, the actual fact respecting the membership of Re-spondent Union among the unit employees has its basis in the records of Respondent Union and therefore particularly within its bosom. In the absence of the production of such records, it is reasonable to infer that their production would reveal facts which would be adverse to the position of Respondent Union. Accordingly, I find that the Respondent Union knew, at the time of the execution of the collective-bargaining agreement at issue, that it did not represent a majority of the employees in the unit."

█ Our study of the proofs persuades us that the Brewery Workers were no longer the choice of the company's employees on April 28, 1969, when the involved contract was negotiated and signed, and that both respondents then knew that such was the case. In International Ladies' Garment Workers Union v. National Labor Relations Board, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961), the Supreme Court held that an unfair labor practice was committed when a company extended recognition to a union which did not represent a majority of the involved employees.

We are satisfied that the proofs justified the factual conclusions of the Board and its examiner and that these ultimate facts provided substantial evidentiary support for the Board's order.

We have come to the foregoing conclusions employing the rules which control us. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Rust Engineering Co. v. N.L.R.B., 445 F.2d 172 (6th Cir.1971); N.L.R.B. v. Flemingsburg Mfg. Co., 300 F.2d 182, 184 (6th Cir.1962).

After the April 28, 1969, contract was signed, the Teamsters petitioned the Regional Director for decertification of the Brewery Workers and for its certification as the bargaining agent for the company's employees. This was done in May, 1969, but the Regional Director dismissed that petition on the ground that the then existence of the contract here under attack barred decertification.

No appeal was taken from such action of the Regional Director and respondents assert that his order was a final adjudication of the validity of the April 28, 1969, contract. This matter before us now had its beginning in a later unfair labor practice charge filed by the Teamsters against the respondents. The Board in its brief in this Court met this contention as follows:

"As a final procedural argument, the parties urge that the Teamsters' failure to seek administrative appeal from the Regional Director's dismissal of their May 5 decertification petition somehow bars prosecution of the present unfair labor practice complaint. However, it is well settled, as the Trial Examiner noted, that in ruling on decertification petitions, the Board *presumes* that an existing contract is valid (and thus a bar to further elections) and will not hear evidence as to whether the contracting union actually enjoyed majority support. *E.g.*, Electro Metallurgical Co., 72 NLRB 1396, 1399 (1947); Mishara Construction Co., 171 NLRB No. 80 n. 4 (1968). Thus, the Teamsters could have gained nothing by appealing the dismissal, since it was clearly proper. The only avenue for attacking the *validity* of the existing contract was an unfair labor practice proceeding, wherein the charging party and the General Counsel would be allowed to prove that the contracting parties entered into the contract with knowledge that the union was a minority union, thereby violating Section 8(a) (2) and (1) and Section 8(b) (1) (A) of the Act.

"In short, since the existing contract was *not* found valid but only presumed valid when the petitions were dismissed, no significance attaches either to the dismissal or the Teamsters' failure to appeal from it." ,.

■ Upon our review of the record, we consider that the procedure followed by the Board was permissible and that it was proper to entertain the Teamsters' charge of unfair labor practice at a plenary hearing.

The Board's order is enforced.