503 F.2d 583
 87 L.R.R.M. (BNA) 2437, 75 Lab.Cas. P 10,370
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
HI-TEMP, INC., et al., Respondents.
PRODUCTION WORKERS UNION LOCAL 10, etc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
HI-TEMP, INC., et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 73-2022 to 73-2024.
 United States Court of Appeals, Seventh Circuit.
 Argued Sept. 9, 1974.
Decided Oct. 10, 1974.
 
 Peter G. Nash, Gen. Counsel, Richard A. Cohen, Atty., N.L.R.B., Washington, D.C., Peter J. Hurtgen, Washington, D.C., for N.L.R.B.
 Arnold E. Charnin, Chicago, Ill., for intervenor.
 George E. Preonas, Chicago, Ill., Sherman M. Carmell and William A. Widmer, III, Chicago, Ill., for Hi-Temp and Production Workers Union Local 10.
 Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge, and CUMMINGS, Circuit Judge.
 CASTLE, Senior Circuit Judge.
 
 
 1
 The National Labor Relations Board petitions this Court to enforce its order against Hi-Temp, Inc., Tru Temp, Inc., and Steel Treating, Inc. ('the Company'), and against the Production Workers Union, Local 10, AFL-CIO ('the Production Workers' or 'the Union') for violations of the National Labor Relations Act, 29 U.S.C. 151 et seq. (1970).
 
 
 2
 The Company is composed of three affiliated corporations comprising an integrated business enterprise. In December 1971, the Production Workers instituted a campaign to organize the Company's employees. Two of its organizers visited employees' homes and secured signatures on Production Workers authorization cards. The United Steelworkers of America, AFL-CIO ('the Steelworkers'), who previously had attempted to organize the Company's employees and failed, protested this encroachment on its 'territory,' and began another drive for employee support.
 
 
 3
 Subsequently, the Production Workers demanded recognition, and the Company agreed to a card check to determine if a majority of the Company's employees had signed Production Workers authorization cards. The card count established that forty-six of the eighty-six employees signed cards for the Production Workers. Although during the card count the Company received and read a letter from the Steelworkers expressing their contunuing organizational interest in the Company's employees, the Company, on the basis of the card check, recognized the Production Workers on January 19, 1972, and on February 25, 1972, agreed to a collective bargaining contract containing union-security and check-off clauses.
 
 
 4
 The NLRB determined, however, that the forty-six cards accepted as a basis for the Production Workers' majority status included cards signed by eight employees who had also signed authorization cards for the Steelworkers. The Board, therefore, excluded these eitht 'dual' cards from the Production Workers' total, and the remaining thirty-eight valid cards were insufficient to establish majority status. Accordingly, the Board found that the Company, by recognizing and contracting with a minority union, had violated Sections 8(a) (2) and 8(a)(3) of the Act,[1] and that the Union had correspondingly violated Sections 8(b)(1)(A) and 8(b)(2).[2]
 
 
 5
 The Company and the Production Workers contest the Board's conclusion that the Union was a minority union at the time of recognition on January 19. They argue that the evidence demonstrates that six of the eight employees who signed both Production Workers and Steelworkers cards signed their Steelworkers cards after the date of the recognition agreement. If those cards were in fact signed after January 19, then the Union had majority status at the time of recognition and the Act would not be violated. We are satisfied, however, that there is substantial evidence on the record considered as a whole to support the Board's conclusion. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
 
 
 6
 The Company and Union rely on testimony that Luis Torres, one of the eight signers of dual cards, signed his Steelworkers card at a Sunday meeting with Steelworkers' organizer Alicea, and that he signed his Production Workers card (dated January 17, a Monday) several days before the Steelworkers card. The Company and Union, therefore, assert that Torres actually signed his Steelworkers card on Sunday, January 23, four days after the recognition agreement was signed, and that his card and the cards which he subsequently passed out to his fellow employees were backdated.
 
 
 7
 It is true that Torres and Alicea testified that the signing took place on a Sunday, and it is apparently uncontested that Torres signed his Production Workers card on January 17. Torres also testified, however, that he signed both the Steelworkers card and the Production Workers card on the same day-- Monday, January 17. In addition, employees Portillo, Samano, Marquina, and Castrejon, who also signed dual cards, testified that Torres gave them Steelworkers cards at work on Monday evening, January 17.[3] Portillo, Samano, and Marquina also testified that they signed their cards that same night, while Castrejon stated that he took his home and signed it the following day. Since it is undisputed that Torres did not distribute the other Steelworkers cards until after he had signed his own, the testimony of Torres and his fellow employees amply supports the Board's finding that Torres and his co-workers signed their Steelworkers cards prior to January 19, and that on that date the Production Workers were a minority union.
 
 
 8
 The Company and the Union next claim that even if the eight employees executed both authorization cards prior to recognition, the Board erred in excluding the dual cards in determining the majority status of the Production Workers. They argue that the cards should be counted because the Company acted in good faith and had no knowledge of the Steelworkers' organizational activities. We cannot agree.
 
 
 9
 In NLRB v. Fishermen's & Allied Workers' Union, Local 33, 483 F.2d 952 (9th Cir. 1973) and Intalco Aluminum Corp. v. NLRB, 417 F.2d 36 (9th Cir. 1969), authorization cards of employees who had signed cards both for the union seeking recognition and for a competing union were excluded in ascertaining majority status, the underlying rationale being that such cards do not reflect a clear and unambiguous selection of a collective bargaining representative. In Playskool, Inc. v. NLRB, 477 F.2d 66, 71 (7th Cir. 1973), we did not question the applicability of that procedure.
 
 
 10
 Although in those cases there may have been knowledge of organizational activities which would cast doubt on the employer's good faith recognition of the union asserting a card majority, we find an employer's good faith to have no effect on the exclusion of the dual cards, because it is employer support of a minority union that the Act condemns. International Ladies' Garment Workers' Union, AFL-CIO v. NLRB, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). The Supreme Court held in International Ladies' Garment Workers' Union, supra, at 738-739, 81 S.Ct. at 1608, that:
 
 
 11
 To countenance such an excuse (of good faith) would place in permissibly careless employer and union hands the power to completely frustrate employee realization of the premise of the Act-- that its prohibitions will go far to assure freedom of choice and majority rule in employee selection of representatives. We find nothing in the statutory language prescribing scienter as an element of the unfair labor practices here involved. The act made unlawful by 8(a)(2) is employer support of a minority union. Here that support is an accomplished fact. More need not be shown, for, even if mistakenly, the employees' rights have been invaded. It follows that prohibited conduct cannot be excused by a showing of good faith.
 
 
 12
 The Board, therefore, properly excluded the eight dual cards regardless of the Company's good faith, and correctly found that the Company and Union violated the Act.
 
 
 13
 Finally, the Company and the Union, relying on Intalco Aluminum Corp., supra, challenge that portion of the Board's order requiring them jointly and severally to reimburse the Company's employees for all dues or fees paid to the Union pursuant to the union-security and check-off clauses of the February 25 collective bargaining agreement. We find the Board's order to be proper.
 
 
 14
 Pursuant to Section 10(c), the Board has been accorded broad authority to fashion remedies to effectuate the policies of the Act. NLRB v. District 50, UMW, 355 U.S. 453, 468, 78 S.Ct. 386, 2 L.Ed.2d 401 (1958); NLRB v. Link-Belt Co., 311 U.S. 584, 600, 61 S.Ct. 358, 85 L.Ed. 368 (1941). One policy as declared in Sections 1, 7, and 9 is that employees have complete and unfettered freedom to select by majority rule their collective bargaining representative. Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 589, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943); NLRB v. Link-Belt Co., supra, 311 U.S. at 588, 61 S.Ct. 358. Thus, in Virginia Electric & Power Co. v. NLRB, supra, the Court upheld a reimbursement order of the Board where a company-dominated union received funds pursuant to a union security agreement on the ground that the employees were supporting a union not of their own free choice. The Court stated:
 
 
 15
 The result (of the union-security and check-off clauses) was that the employees . . . had to authorize wage deductions for dues to remain members . . ., and they had to remain members to retain their jobs. Thus, as a price of employment they were required by the Company to support an illegal organization which foreclosed their rights to freedom of organization and collective bargaining. To hold that the Board is without power here to order reimbursement of the amounts so exacted is to hold that an employer is free to fasten firmly upon his employees the cost of maintaining an organization by which he effectively defeats the free exercise of their rights to self-organization and collective bargaining. That this may pervert the purpose of the Act is clear.
 
 
 16
 Id. 319 U.S. at 540, 63 S.Ct. at 1219.
 
 
 17
 Here there is no company-dominated union. Nonetheless, when a minority union is recognized in violation of 8(a)(2) of the Act, and in accordance with union-security and check-off provisions employees are forced to support and contribute to that union to retain their jobs, we believe the employees' freedom to select and support a collective bargaining representative of their own choosing is similarly defeated, regardless of the employer's intentions. The Board's remedial order effectuates the policy of the Act because it fully restores the employees' freedom to select and support only that union which has achieved majority status. Virginia Electric & Power Co. v. NLRB, supra; Sheraton-Kauai Corp. v. NLRB, 429 F.2d 1352, 1357-1358 (9th Cir. 1970).
 
 
 18
 The Company and the Union rely on statements by the Court in International Ladies' Garment Workers' Union, supra, 366 U.S. at 740, 81 S.Ct. at 1608, that when an employer violates 8(a)(2), the employer is subject only to a 'remedial order requiring him to conform his conduct to the norms set out in the Act . . .. No further penalty results.' That reliance is misplaced because there the contract did not contain union-security clauses, and the Court did not have before it a dues reimbursement remedy.
 
 
 19
 The petition for enforcement is granted.
 
 
 20
 Enforced.
 
 
 
 [1]
 29 U.S.C. 158(a)(2), (a)(3) (1970) provide in part:
 (a) It shall be an unfair labor practice for an employer--
 . . . .ll
 (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it . . .. (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . ..
 
 
 [2]
 29 U.S.C. 158(b)(1)(A), (b)(2) (1970) provide in part:
 (b) It shall be an unfair labor practice for a labor organization or its agents-- (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title . . .. (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section . . ..
 
 
 [3]
 Of the six employees whose dual card signings are contested, only Marquez was unavailable to testify. Steelworkers' organizer Alicea testified, however, that Marquez signed the Steelworkers card in his presence on Monday, January 17, and the card bears that date