H. & F. BINCH CO. PLANT OF the NATIVE LACES AND TEXTILE DIVISION OF INDIAN HEAD, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 376, 377, Dockets 71–1229, 71–1356.

United States Court of Appeals, Second Circuit.

Argued Jan. 7, 1972.

Decided Feb. 17, 1972.

Fred W. Elarbee, Jr., Atlanta, Ga. (Lowell W. Olson and Constangy & Prowell, Atlanta, Ga., of counsel), for petitioner.

Jack H. Weiner, Washington, D. C. (Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and William Wachter, Washington, D. C., of counsel), for National Labor Relations Board.

Before FRIENDLY, Chief Judge, and MOORE and OAKES, Circuit Judges.

FRIENDLY, Chief Judge:

I.

This labor dispute stemmed from the posting by an employer, H. & F. Binch Co. Plant of the Native Laces and Textile Division of Indian Head, Inc. (hereafter Binch), of a new work schedule for its greige mill at Glens Falls, N. Y., late in the afternoon of Friday, March 15, 1968.

The notice, signed by Cavanaugh, manager of the greige mill, informed the employees that in order to increase production to fulfill commitments to customers, "effective immediately and until further notice, all departments in the greige mill will work a seven day week schedule. . . ." Each of the three shifts was to get one day off; on those days the other two shifts were to work twelve hours each.

It was scarcely surprising that the notice provoked a lively reaction among the then unorganized employees of the raschel (knitting) department, which is in the greige mill. At 8:00 P.M., two hours before the end of their shift, 15, or somewhat less than half, of the employees on the evening shift in the raschel department, acting by prearrangement, met and walked out of the plant in protest, without punching their time cards. Having repaired to a nearby café and consulted Rhodes, the head of the Greater Glens Falls Labor Council, they voted to return in a body at 2:00 P.M. on the following day, March 16, when their next shift would begin. They did not communicate this decision to Binch.

Red Macey, the foreman, and John Armstrong, the assistant production foreman, who had observed the walkout, immediately informed Cavanaugh, who contacted Plant Manager Misogianes and Plant Personnel Manager LaVaute. Friends and relatives of management personnel and employees who had remained at their jobs were hastily called in that evening to man the strikers' machines. Macey pulled from the rack the timecards of the employees who had walked out, inadvertently omitting the timecard of Joan Shippe. Misogianes was in telephone communication with Binch's counsel in Atlanta, Georgia. Counsel advised that Binch could protect its production by hiring immediate replacements for the strikers but could not discharge them. LaVaute and Misogianes got to work on this early on Saturday morning, reviewing recent applications and asking supervisors to contact anyone they knew who might be interested in a job. By noon the

Company had ostensibly replaced all 15 strikers and had noted on its records just who replaced whom. Misogianes reported this to counsel who advised that if the strikers showed up for work, they should be told they had been replaced and should report to the personnel office on Monday morning if they wished to apply for work —correct advice if the replacements had in fact been made. Misogianes relayed this to Macey.

At 2:00 P.M. the 15 strikers went into the mill as a group. As they walked past the timeclock, Foreman Macey asked where they were going. When they answered they were going to work, he said "I'm sorry but you have been replaced. You have to report to the personnel office at 8:00 A.M. Monday morning." As the group was leaving, Joan Shippe noticed that her timecard was still on the rack. Conversation developed that she had been part of the group that had walked out and that she had been replaced; Macey removed her timecard.

The group went back to the Hideaway and reported their misadventure to Rhodes. It was decided that the Textile Workers Union of America, AFL–CIO, (TWUA) would sponsor a meeting on Sunday. A leaflet was prepared, stating in effect that the meeting was scheduled "for the employees about those fifteen employees getting discharged." About 50 employees attended. Rubenstein, state director of the TWUA, told the meeting that when the 15 had sought to return to their jobs, "they found they had been replaced by other employees" and this was "very unfair." All agreed to strike "in sympathy for those people that went out."

Some 25 employees not previously on strike failed to report for work on Monday, March 18, and picketing began. After meetings that day and the next, two

members of a committee that had been formed sent a telegram on March 19, requesting a meeting and containing an offer to return to work which we set out in the margin.[1] Some of the March 18 strikers who had not been replaced came back to work and were reinstated without incident. By March 23, seventeen replacements for the March 18 strikers had been hired and one employee was transferred from another part of the mill.

On April 3 the strikers' committee sent a second telegram stating that the strikers offered to "return to work unconditionally." Misogianes answered that any striker desiring to make such an offer should contact the personnel office individually. Most of the strikers signed individual letters advising that the employee offered to return to work unconditionally and asking to be advised when he or she might do so. On April 9 all strikers who had by that time signed such letters, plus one additional striker who had not, went to the mill as a group. LaVaute refused to speak to them as such but said he would be glad to interview them individually. They were interviewed as to their job and shift desires. When asked whether they would accept a job in some other department or shift, several replied that they would but only under protest since they preferred their old jobs.

The company prepared a preferential hiring list of 24 strikers who had sent letters or appeared at the personnel office. In late April and May it began hiring new employees, mostly to man a third shift in the finishing department. Binch was diligent in contacting the 24 employees as openings occurred; twelve accepted. They were hired as new employees at the minimum rate, with fringe benefits to be acquired only as earned

1. . . . THIS IS TO ADVISE YOU THAT ALL THE EMPLOYEES NOW ON STRIKE OFFER TO RETURN TO WORK IMMEDIATELY PROVIDED YOU AGREE TO TAKE EVERYONE BACK WITHOUT DISCRIMINATION. ALL EMPLOYEES ARE WILLING TO RETURN PROVIDED YOU ARE WILLING TO AGREE NOT TO DISCRIMINATE AGAINST ANY WORKERS INCUDING THE RASCHEL WORKERS FOR THE PROTEST WALKOUT CONCERNING THE CHANGE IN WORKING HOURS AND YOUR FAILURE TO DISCUSS SAME. . . .

by the new service. Beginning in June, jobs formerly held by the strikers began to open up. Both strikers who had returned, and some who had not, asked for such openings but were refused in favor of persons whose employment antedated April 6. With respect to six employees Binch changed this policy after June 19, 1968, when the NLRB made public its June 13 decision in The Laidlaw Corp., 171 N.L.R.B. No. 175, enforced 414 F.2d 99 (7 Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970); as to others it did not.

A three-man panel of the Board concluded that only eleven of the fifteen March 15 strikers had in fact been replaced before 2:00 P.M. on March 16; that the striking employees' offer to return to work on that date was unconditional;[2] and that, accordingly, the March 18 strike was an unfair labor practice strike. It held in consequence that Binch violated § 8(a) (3) and (1) of the National Labor Relations Act by failing to reinstate the March 18 strikers within five days after their submitting individual applications for reinstatement. It found a similar violation in the failure to reinstate the four March 15 strikers who, in its view, had not been replaced by 2:00 P.M. on March 16. It found further violations in the failure to accord four other March 15 strikers the rights to their old jobs when these became available, as the Laidlaw decision demanded.[3] The order contained cease and desist provisions and directions for reinstatement and backpay consistent with these conclusions.

Challenging the order, Binch contends that it had replaced all fifteen March 15 strikers by 2:00 P.M. on March 16, or at least believed in good faith that it had; that the March 15 strikers did not make an unconditional offer to return to work on March 16; that, for both these reasons, the Board erred in concluding that the March 18 strike was an unfair labor

practice strike and in ordering relief with respect to March 18 strikers which would be appropriate only on that basis; that the Laidlaw decision was unwarranted; and that, in any event, it should not be retroactively applied in this case. We sustain only some of these contentions.

II.

The principles governing the rights and duties of an employer with respect to economic strikers were early enunciated in NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345–46, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). After stating that such strikers remained "employees" under § 2(3) of the Act, Mr. Justice Roberts continued:

> Nor was it an unfair labor practice to replace the striking employes with others in an effort to carry on the business. Although § 13 provides, "Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike," it does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect and continue his business by supplying places left vacant by strikers. And he is not bound to discharge those hired to fill the place of strikers, upon the election of the latter to resume their employment, in order to create places for them. The assurance by respondent to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice nor was it such to reinstate only so many of the strikers as there were vacant places to be filled.

This left for subsequent determination the subsidiary question of just what circumstances constituted a hiring to fill the place of strikers. This must be answered in a practical frame. When strikers have resorted to the

---

2. Chairman Miller dissented from this conclusion, and the consequent holding that the March 18 strike was an unfair labor practice strike.

3. Chairman Miller dissented from this conclusion insofar as it gave Laidlaw retroactive effect.

economic weapon of endeavoring to impair production, the employer is entitled to respond with efforts to preserve it and must have latitude in hiring replacements sufficient, but no more than sufficient, to that end. On the one hand, a mere offer, unaccepted when the striker seeks reinstatement, is insufficient to qualify; on the other, actual arrival on the job should not be required if an understanding has been reached that this will occur at a reasonably early date, cf. Anderson, Clayton & Co., 120 N.L.R.B. 1208, 1214 (1958). The standard established by the Board in earlier decisions appears to have been that a replacement has been obtained if, but only if, both the employer and the replacement understand that the latter has accepted the vacant position before the replaced striker offered to return to work. See Hot Shoppes, Inc., 146 N.L.R.B. 802, 803–05 (1964); Georgia Highway Express, Inc., 165 N.L.R.B. 514, 516 (1967), aff'd 131 U.S.App.D.C. 195, 403 F.2d 921, cert. denied, 393 U.S. 935, 89 S.Ct. 296, 21 L.Ed.2d 272 (1968); Coca Cola Bottling Co., 166 N.L.R.B. 134, 138 (1967). Since such hirings are almost always oral and at will, it is not necessary that conversations should have taken a form where the "replacement" would have a cause of action if a striker was allowed to return to work before the replacement arrived on the scene. Perhaps the Trial Examiner's phrasing, that the replacement would have reasonable "grounds for indignation" if he were subsequently denied the promised job, is about as good a formulation of the appropriate standard as can be achieved.

In this case, two of the alleged replacements found by the Board to be invalid were new hires; two were transfers. Both the transferees, Burch and Mumblo, who replaced strikers Wilson and Potter, were actually at work in the raschel department at 2:00 P.M. on March 16. The Board's basis for refusing to recognize them as permanent replacements was that their former positions, Burch's in the shipping department and Mumblo's in the finishing department, were not refilled until later, and that therefore they should simply have been retransferred to their former job upon the return of the strikers. We cannot sustain this, at least under the circumstances of this case. The evidence is uncontradicted that Burch had become dissatisfied with his job in the shipping department and would have quit if he had not been transferred. Mumblo had actively sought a transfer prior to March 16. Since a mutual understanding concerning transfer to the raschel department had been reached in both cases prior to any offer to return by the strikers, we see no reason why these two employees should be treated differently from new hires for purposes of replacement simply because Binch might or might not have been able to persuade them to return to their old jobs.[4] Protection of the right to strike guaranteed by § 7 does not require going so far. A case where an employee transferred simply to accommodate the employer and would have cheerfully returned to his old post would be a different one, which we need not here decide.

On the other hand, we sustain the Board with respect to the two new hires, Davis and Parker, who allegedly replaced strikers Gatchell and Harding. Binch had learned of Davis' possible availability as a result of a talk between Foreman Plude's wife and Davis' mother some days before March 16. When Plude called the mother that day, Davis was away, but she purported to accept the job on his behalf. Davis did not communicate with Plude until Sunday, March 17, and did not complete an application form until Tuesday, March 19. Parker's case is closer. She had been employed as an extra girl and had indicated a desire for

---

4. The Trial Examiner concluded that even if Binch was not obligated to retransfer Mumblo and Burch to their old jobs upon return of the strikers, it should have offered to reinstate Wilson and Potter in the positions vacated by the transferees. The Board, however, specifically declined to adopt this view; nor is it argued for here. Hence, we see no need to consider it.

regular employment. However, Binch had been unable to reach her before 2:00 P.M. on March 16 and, as the Trial Examiner concluded and as the Board agreed, she "would hardly have had grounds for indignation" if Binch had rescinded the record entry of which she was unaware. We thus conclude that Binch was not justified in refusing to reinstate Gatchell and Harding when they unconditionally requested this.[5]

### III.

■ However, a good deal hangs on whether such a request was made on March 16 or only in early April. If the former, as the majority of the Board panel held, the March 18 strike was an unfair labor practice strike and the March 18 strikers were entitled to immediate reinstatement when they sought this, whether they had been replaced or not. If the latter, as the Chairman held, the March 18 strike was an economic strike and the March 18 strikers were not entitled to reinstatement except as jobs opened up.

■ We think the majority's conclusion was not "supported by substantial evidence on the record considered as a whole." § 10(e). Granted that the employer has the burden of showing that the offer to return was not unconditional, it is reasonable to require, particularly in a case like this where most of the strikers had been replaced, that they manifest some indication of willingness to accept reinstatement only of those who had not been. Had they done so, there is every likelihood that Binch, whose senior officials were endeavoring to conduct themselves in a manner consistent with the law, would again have consulted counsel and would have been advised to examine the status of the replacements with care.[6] Here everything the March 15 strikers did until April 3 was calculated to give Binch the impression that their demands were for reinstatement of all. The vote of the *group* taken on March 15 itself was to decide whether the group would stay out or would return to work, as such. The 2:00 P.M. démarche was made as a group; when Macey told the strikers they had been replaced, no one inquired whether they all had been or asked to discuss the matter with higher authority. The

5. Binch suggests that it should not be found to have violated § 8(a) (3) and (1) if it believed in good faith that Davis and Parker constituted replacements. We find nothing in the relevant Supreme Court decisions, NLRB v. Mackay Radio & Telegraph Co., *supra*, 304 U.S. at 345-46, 58 S.Ct. 904, 82 L.Ed. 1381; NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 33-34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); and NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 379, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), that supports this. Compare International Ladies' Garment Workers Union v. NLRB, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964). See also Welch Scientific Co. v. NLRB, 340 F.2d 199, 203 (2 Cir. 1965).

6. This sufficiently answers the argument made in this court by Board counsel, although not relied on by the Trial Examiner or, as we read its opinion, by the Board, that even if the strikers had made an unconditional offer to return on March 16, Binch would not have accepted any of them. We do not consider anything in our decision in Colecraft Mfg. Co. v. NLRB, 385 F.2d 998, 1005 (2 Cir. 1967), to require a different conclusion. There, among other things, it was suggested that whether the strikers' offer to return to work was unconditional was irrelevant where the employer did not rely on the conditional nature of the offer in denying reinstatement to certain strikers. But in that case, the employer was given notice by telegram of the precise offer to return and had substantial opportunity to assess its position and frame its response; here there was but a brief encounter between the foreman and the strikers. This is not the sort of case in which an offer to return by each striker was unnecessary because the employer had previously made plain that such an offer would be futile. Compare NLRB v. Park Edge Sheridan Meats, Inc., 323 F.2d 956, 959 (2 Cir. 1963). It is not to be assumed that counsel, or even Misogianes, would have approved refusal to reinstate Gatchell and Harding if they had been fully informed of the strikers' precise position and had been given an opportunity to evaluate it.

leaflet prepared immediately thereafter referred to the discharge of all 15 employees, not just of those who had not been replaced. The tenor of the Sunday meeting was similar. The Board concedes that the telegram sent on Tuesday, March 19, see footnote 1, was not an unconditional offer to return to work. The argument is, however, that there was an earlier unconditional offer and the telegram simply served to revoke this. But we do not see any evidence of an earlier unconditional offer; the demand of the workers—by no means an unnatural position—was that all fifteen of the March 15 strikers must be reinstated. The only testimony bearing directly on the strikers' intention, that of Joan Shippe on examination by the general counsel, was that she would have gone back to work on March 16 "[i]f the rest of them had gone back . . . with me." There is no basis for thinking she stood alone.[7]

## IV.

█ The remaining issues concern the validity and applicability of the Board's decision in The Laidlaw Corporation, 171 N.L.R.B. No. 175 (1968), enforced 414 F.2d 99 (7 Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). The Board there held that economic strikers who unconditionally apply for reinstatement at a time when their positions are filled by permanent replacements are entitled, upon departure of the replacements, to reinstatement to their former positions and fringe benefits unless they have acquired regular and substantially similar employment or the employer proves that his failure to offer full reinstatement was for legitimate and substantial business reasons. We agree with other circuits, for the reasons stated by them, that such a decision was a permissible extrapolation from what the Supreme Court had decided in NLRB v. Great Dane Trailers, Inc., *supra,* 388 U.S. at 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 and NLRB v. Fleetwood Trailer Co., *supra,* 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614. See, in addition to the Seventh Circuit decision enforcing *Laidlaw,* American Machinery Corp. v. NLRB, 424 F.2d 1321 (5 Cir. 1970); C. H. Guenther & Son, Inc. v. NLRB, 427 F.2d 983 (5 Cir.), cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970); NLRB v. Johnson Sheet Metal, Inc., 442 F.2d 1056, 1061 (10 Cir. 1971); NLRB v. Hartmann Luggage Co., 453 F.2d 178 (6 Cir. 1971).

Binch contends that even if *Laidlaw* was a permissible decision, it should not be applied so as to require back pay prior to its date, in respect of conduct by an employer which conformed to previously enunciated Board policy. Other courts have rejected that contention. The Fifth Circuit, in an opinion by Judge Wisdom, American Machinery Corp. v. NLRB, *supra,* 424 F.2d at 1330, quoted our observation in NLRB v. A.P.W. Prods. Co., 316 F.2d 899, 905 (2 Cir. 1963):

> "[W]hen an administrative agency makes law as a legislature would, it must follow the rule-making procedure . . . and when it makes law as a court would, it must follow the adjudicative procedure . . .; whether to use one method of law making or the other is a question of judgment, not of power."

While we are honored by such recognition, we think the problem here is somewhat more serious than in *A.P.W. Products.* The decision which the Board

---

7. The Trial Examiner made much of a point relating to Mrs. Shippe's testimony. On recross examination Binch's counsel asked her, "[I]f five of the fifteen had been replaced, then you all wouldn't have taken your jobs?" The examiner overruled general counsel's objection but postponed the answer in order to allow counsel to take a special appeal to the Board. After the Board sustained the ruling, Binch's counsel neither pursued the question with Mrs. Shippe nor asked it of other strikers. We see little significance in this. Apparently Binch's counsel decided on reflection to follow the wise policy of leaving a satisfactory record alone rather than asking that "one more question" which all too often leads to disaster.

there applied retroactively had overruled a previous holding that backpay awards were tolled for the period between an examiner's dismissal of a discriminatory discharge complaint and the Board's reversal of him. Clearly no employer had engaged in discriminatory discharges on the faith that if a Board examiner were sometime to rule in his favor he would have no backpay liability for the period between that date and a reversal by the Board. Here, in contrast, the *Laidlaw* decision established a new norm of employer conduct toward strikers who had sought or achieved reinstatement, cf. NLRB v. Majestic Co., 355 F.2d 854, 860–61 (2 Cir. 1966). Binch, in effect, is saying that the time has come when courts should stop merely shedding crocodile tears over the Board's failure to utilize its rule making power and calling its attention to the Supreme Court's "rather pointed hint" on that subject in the second *Chenery* case, SEC v. Chenery Corp., 332 U.S. 194, 202, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), and should administer the one kind of medicine the Board will have no difficulty in understanding. Compare United States v. Antonelli Fireworks Co., 155 F.2d 631, 661–662 (2 Cir.), (dissenting opinion of Frank, J.), cert. denied, 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946).

 · It is indeed surprising that the Board should so consistently have refused to utilize its rule-making power, or to develop techniques of prospective ruling and overruling save in one notable instance where it overdid this. NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), dealing with Excelsior Underwear, Inc., 156 N.L.R.B. 1236 (1966). Starting with what was only a gleam in Judge Cardozo's perceptive eye,[8] this technique has

evolved so that now almost any enunciation of a new doctrine or repudiation of an old one carries, or is shortly given, a tag announcing as of when it speaks. See Schaefer, The Control of "Sunbursts": Techniques of Prospective Overruling, 22 Rec. of Ass'n of the Bar of the City of New York 394 (1967), reprinted in 42 N.Y.U.L.Rev. 631 (1967). It would be unfortunate if the *Excelsior* fiasco should deter the Board from further experimentation along these lines. See The Supreme Court, 1968 Term, 83 Harv. L.Rev. 7, 226–27 (1969). On the other hand, we do not deem this case an appropriate vehicle for taking the action the company seeks. As Judge Wisdom said in *American Machinery Corp., supra,* 424 F.2d at 1328, "The Supreme Court's decision in *Fleetwood* should have demonstrated the erosion of employers' freedom in treating jobless economic strikers as new applicants"; the extension in *Laidlaw* thus was hardly a great surprise. Also we must weigh the hardship in imposing liability on the company for conduct conforming to what it may reasonably have thought the limit of its duties against the hardship to the employees in being denied important rights that are now recognized to have been properly theirs. We shall therefore await a stronger case before we refuse to give retroactive force to a Board order because it was founded on a decision enunciating a stricter rule of conduct for employers or unions than the Board had previously imposed.

The Board's order is modified as indicated in this opinion and, as so modified, is enforced. The parties are directed to endeavor to agree on a form of order; if this cannot be done, it shall be settled on ten days notice. No costs.

---

8. See The Nature of the Judicial Process 146–49 (1921); *Address to the New York State Bar Ass'n,* 1932 N.Y.S.B.A. Report 263, 293–295; Great Northern Ry. v. Sunburst Oil & Refining Co., 287 U.S. 358, 364, 53 S.Ct. 145, 77 L.Ed. 360 (1932).