[No. 7478-4-I.   Division One.   May 27, 1980.]

WESTERN WASHINGTON CEMENT MASONS HEALTH & SECURITY TRUST FUNDS, ET AL, *Respondents,* v. HILLIS HOMES, INC., ET AL, *Appellants.*

*Edward Heavey* and *Heavey & Woody,* for appellants.

*David P. Wolds* and *Donaldson & Kiel, P.S.,* for respondents.

RINGOLD, J.—Hillis Homes, Inc., appeals the trial court's judgment that it is liable according to the terms of a purported collective bargaining agreement for payments to certain trusts for the benefit of its employees.

On June 17, 1974, Larry Hillis, president of Hillis Homes, Inc., was threatened with picketing at Hillis Homes' construction site unless he signed a labor agreement, captioned "Collective Bargaining Agreement," (Agreement) with the Cement Masons International Association, AFL–CIO (Union). Anxious that Hillis Homes' work not be stopped,

Hillis signed the agreement the same day. Since there had been no certification election to determine majority support for the union within the Hillis work unit, the Agreement was a "prehire" agreement, *i.e.*, one in which the union and the employer agree to have a union shop before there is any showing of a majority support among the employees for the union. R. Gorman, *Labor Law* 648 (1976). The labor agreement incorporated by reference provisions of the trust agreement, which define "employee" as "any employee of an Individual Employer who performs work of a type covered by the collective bargaining agreement. . . ." All Hillis Homes employees, regardless of union affiliation, were entitled to have contributions made for their benefit. Regarding its duration, the Agreement provides as follows:

> This Agreement shall become effective June 1, 1974 and shall remain in full force and effect until June 1, 1977 and shall be automatically renewed from year to year thereafter, provided, however, that any party hereto desiring changes or modifications of the Agreement shall give notice thereof in writing to the other party not later than sixty (60) days prior to June 1, 1977, or any given year thereafter. . . .

In accordance with this term, Hillis Homes terminated the Agreement by its notice of March 1978. During the term of the Agreement contributions were made for one union member; the trusts commenced the present lawsuit in June 1977 to recover contributions for nonunion employees.

## ISSUES

1. Is the Agreement unenforceable because it is a prehire agreement?

2. Did the trial court err in concluding that union duress did not invalidate the purported collective bargaining agreement?

3. Was the Agreement abandoned by the trusts?

ENFORCEABILITY

Hillis Homes contends that the Agreement here is wholly unenforceable because it is a prehire agreement reliant upon 29 U.S.C. § 158(f) (1973) for its validity. For that proposition it cites *NLRB v. Local 103, Iron Workers,* 434 U.S. 335, 54 L. Ed. 2d 586, 98 S. Ct. 651 (1978) (*Iron Workers*). The *Iron Workers* case is distinguishable, and is therefore not authority regarding enforceability of a prehire agreement by third–party beneficiaries in a state court lawsuit to enforce the agreement.

The relevant statute provides as follows:

> It shall not be an unfair labor practice . . . for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members . . . because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, . . . *Provided* . . ., That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

29 U.S.C. § 158(f) (1970) (National Labor Relations Act § 8(f)).

Before the enactment of section 158(f), the execution of a prehire agreement by an employer and a union constituted an unfair labor practice by both.

> "There could be no clearer abridgment of § 7 of the Act, [National Labor Relations Act] assuring employees the right 'to bargain collectively through representatives of their own choosing' or 'to refrain from' such activity" than to grant "exclusive bargaining status to an agency selected by a minority of its employees, thereby impressing that agent upon the nonconsenting majority." *Garment Workers v. NLRB,* 366 U. S. 731, 737 [6 L. Ed. 2d 762, 81 S. Ct. 1603] (1961).

*Iron Workers,* at 344.

Section 158(f) was motivated by special conditions prevailing in the construction industry. Two aspects of the building trades set them apart from other industries so as to justify use of prehire agreements with unions that were without majority representation:

> "One reason for this practice is that it is necessary for the employer to know his labor costs before making the estimate upon which his bid will be based. A second reason is that the employer must be able to have available a supply of skilled craftsmen ready for quick referral." [H.R. Rep. No. 741, 86th Cong., 1st Sess. 19 (1959)].

*Iron Workers,* at 348.

The Senate Report noted "that '[r]epresentation elections in a large segment of the industry are not feasible to demonstrate . . . majority status due to the short periods of actual employment by specific employers.' S. Rep. No. 187, 86th Cong., 1st Sess. 55 (1959)". *Iron Workers,* at 349. We have been unable to find any case regarding enforcement of third–party beneficiary rights under a prehire agreement; until *Iron Workers,* the Supreme Court had not addressed the scope of this special proviso.

In *Iron Workers* the employer who had entered into a prehire agreement undertook construction jobs with non-union labor. The union picketed those sites with signs proclaiming that the employer was violating an agreement with the union. The employer filed a charge with the National Labor Relations Board (NLRB) alleging that the union was violating section 8(b)(7)(C) of the act, which makes it an unfair labor practice for a union whose majority status has not been established to picket for the purpose of forcing an employer to recognize the union as a bargaining representative of his employees. 29 U.S.C. § 158(b)(7)(C). The NLRB, finding that the object of the picketing was recognitional, agreed with the employer and issued a cease and desist order. *Local 103, Int'l Ass'n of Iron Workers, & Higdon Contracting Co.,* 216 NLRB Dec. 45 (1975). The Court of Appeals held that the prehire agreement was

enforceable by picketing as well as by filing an unfair labor practice charge against the employer for failure to bargain. *Local 103, Iron Workers v. NLRB,* 535 F.2d 87 (D.C. Cir. 1976). The NLRB and the District of Columbia Circuit now twice at odds over the same question, *R.J. Smith Constr. Co. and Local 150, Int'l Union of Operating Eng'rs,* 191 NLRB Dec. 693 (1971), *Local 150, Int'l Union of Operating Eng'rs v. NLRB,* 480 F.2d 1186 (D.C. Cir. 1973), the United States Supreme Court granted certiorari. 429 U.S. 1089, 51 L. Ed. 2d 534, 97 S. Ct. 1097 (1977).

The Supreme Court framed the principal issue as "how § 8(f) is to be construed and of what consequences the execution of a prehire agreement has on the enforcement of other sections of the Act, primarily §§ 8(a)(5) and 8(b)(7)(C)." *Iron Workers,* at 341. The fundamental premise of the Supreme Court's opinion in *Iron Workers* is that the overriding policy objective of the 1959 amendments to the National Labor Relations Act, among which are sections 8(f), 8(b)(7), and 8(a)(5), is the protection of workers' freedom of choice in electing their bargaining representative. *Iron Workers,* at 344. The court cited *Connell Constr. Co. v. Plumbers & Steamfitters Local 100,* 421 U.S. 616, 632, 44 L. Ed. 2d 418, 95 S. Ct. 1830 (1975): "'[o]ne of the major aims of the 1959 Act was to limit "top down" organizing campaigns, in which unions used economic weapons to force recognition from an employer regardless of the wishes of his employees.'" *Iron Workers,* at 346–47.

The court went on:

> The use of picketing was of particular concern as a method of coercion in three specific contexts: where employees had already selected another union representative, where employees had recently voted against a labor union, and where employees had not been given a chance to vote on the question of representation. Picketing in these circumstances was thought impermissibly to interfere with the employee's freedom of choice.

*Iron Workers,* at 347. Then citing authority for the proposition that courts should give deference to administrative

agencies' determinations of questions committed primarily to them, *Iron Workers,* at 350, the court reinstated the NLRB holding that it is an unfair labor practice within the meaning of section 8(b)(7)(C) for an uncertified union not representing a majority of the employees to engage in extended picketing in an effort to enforce a prehire agreement with the employer. *Local 103, Int'l Ass'n of Iron Workers, & Higdon Contracting Co., supra.* We believe that a proper interpretation of the *Iron Workers* case is that a prehire agreement is not enforceable by union picketing.[1]

In the present case the issue is whether a prehire agreement is enforceable by a third–party beneficiary in a state court lawsuit for breach of contract.

Having determined that the *Iron Workers* case is authority only for the proposition that prehire agreements are not enforceable by picketing, we turn to similar areas of labor law for guidance. State courts must follow the federal law, as fashioned by the federal courts, to effectuate the statutory policy of enforcement of collective bargaining agreements. *Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 7 L. Ed. 2d 593, 82 S. Ct. 571 (1962).

Besides the exception to the general proscription of prehire agreements, Congress also enacted an exception to the proscription of "hot cargo" agreements for the construction industry in 1959. 29 U.S.C. §§ 158(b)(4)(B), 158(e) (1970). A "hot cargo" agreement requires an employer, a neutral party, to refrain from handling products of another or to cease doing business with another person with whom the union has a dispute. R. Gorman, *Labor Law* 262 (1976).

---

[1] We are aware that there is dictum at the end of the opinion in which the court distinguishes prior dictum in *Retail Clerks Int'l Ass'n, Locals 128 & 633 v. Lion Dry Goods, Inc.,* 369 U.S. 17, 7 L. Ed. 2d 503, 82 S. Ct. 541 (1962), and imply that section 8(f) contracts might be unenforceable by a lawsuit on the contract. We believe this language, unnecessary to the narrow holding of the case, to be of no precedential authority. Further, the court in *Iron Workers* did not consider the rights of third parties, whether trusts or workers, arising out of a prehire agreement.

The Supreme Court had interpreted section 8(b)(4) to allow "voluntary adherence" to hot cargo agreements, *Local 1976, United Brotherhood of Carpenters v. NLRB,* 357 U.S. 93, 98–99, 2 L. Ed. 2d 1186, 78 S. Ct. 1011 (1958) (*Sand Door*), but had held that a union could not seek enforcement of such agreements through economic coercion. *Sand Door,* at 106. Congress passed section 8(e) making it an unfair labor practice to enter into a hot cargo agreement except:

> [t]hat nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction . . . or repair of a building . . . or other work . . .

29 U.S.C. § 158(e) (1970). In *NLRB v. International Bhd. of Elec. Workers & Local 769,* 405 F.2d 159, 163 (9th Cir. 1968), *cert. denied,* 395 U.S. 921, 23 L. Ed. 2d 237, 89 S. Ct. 1772 (1969), the Ninth Circuit Court of Appeals interpreted this proviso:

> [I]t appears that Congress intended to limit the enforcement of proviso–saved agreements to judicial means. The Conference Report stated: "It is not intended to change the law with respect to judicial enforcement of these contracts. * * *" In light of the Congressional objective of limiting the enforcement of valid hot cargo agreements to judicial means and freeing the contractors from direct economic pressures to enforce such agreements, we agree with the Board that the construction industry proviso may not be read as permitting the inclusion of provisions into a collective bargaining agreement which purport to authorize 8(b)(4) violations.

(Citation omitted.) *See also Iron Workers,* at 349 n.11.

The Supreme Court recently held that a union may not enforce a concededly valid work preservation clause[2]

---

[2]A work preservation clause refers to an agreement by an employer not to contract away work currently done by the unit, and not to use materials upon which work ordinarily done by the unit has already been done. *Cf. National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 18 L. Ed. 2d 357, 87 S. Ct. 1250 (1967).

through economic coercion, but suggested that such clauses may be enforced by a lawsuit on the contract. The case arose when an employer with whom the union had negotiated a labor agreement could no longer grant the work because a subcontractor was bound by mutually exclusive agreements. *NLRB v. Enterprise Ass'n of Pipefitters, Local 638,* 429 U.S. 507, 51 L. Ed. 2d 1, 97 S. Ct. 891 (1977) (*Enterprise*). The court stated:

> Even though a work–preservation provision may be valid in its intendment and valid in its application in other contexts, efforts to apply the provision so as to influence someone other than the immediate employer are prohibited by § 8(b)(4)(B).

*Enterprise,* at 521 n.8. As "hot cargo" clauses and work preservation clauses in construction industry labor contracts, prehire agreements should also be enforceable by lawsuits on the contracts.

In addition to these analogical guideposts for adjudication, we feel that refusal to allow enforcement of a prehire agreement by a lawsuit would effectively render section 8(f) meaningless, and would, therefore, run counter to the rule that statutes are to be construed so as to give effect to every word. *Hayes v. Yount,* 87 Wn.2d 280, 290, 552 P.2d 1038 (1976); 2A C. Sands, *Sutherland's Statutes and Statutory Construction* § 46.06 (4th ed. 1973). In *Iron Workers* the Supreme Court pointed out that one reason their interpretation of section 8(f) does not render that section meaningless is that section 8(f) is similar to section 8(e), and section 8(e) has been interpreted so that it, too, cannot be enforced by economic coercion. *Iron Workers,* at 349 n.11. Of course, the main reason that such an interpretation of section 8(e) does not render it meaningless is that construction industry "hot cargo" clauses are enforceable by lawsuits on the contract. *NLRB v. International Bhd. of Elec. Workers & Local 769, supra.* Similarly, the preservation of state court remedies for the protection of third–party beneficiaries' rights pursuant to a prehire agreement

is the minimal effect that can be accorded section 8(f) to prevent it from being wholly meaningless.

Protection of third–party beneficiary rights in labor contracts is strongly supported by labor policy, and may even be enforceable in some situations in which signatories' rights would not be. *Lewis v. Benedict Coal Corp.,* 361 U.S. 459, 4 L. Ed. 2d 442, 80 S. Ct. 489 (1959); *Trust Fund Servs. v. Heyman,* 88 Wn.2d 698, 565 P.2d 805, *cert. denied,* 434 U.S. 987, 54 L. Ed. 2d 483, 98 S. Ct. 618 (1977). Congress has declared a national public interest in the protection of employee benefit rights, 29 U.S.C. § 1001 (1975), in the interest of whose enforcement every intendment should be indulged.

We, therefore, hold that while a prehire agreement may not be enforceable through economic coercion by the union, it is enforceable by a third–party beneficiary in a lawsuit on the contract. State courts' jurisdiction to entertain lawsuits on labor contracts has been upheld in *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 7 L. Ed. 2d 483, 82 S. Ct. 519 (1962); *cf.* 29 U.S.C. § 158(a); *Trust Fund Servs. v. Heyman, supra* at 704.

## DURESS

Hillis Homes presents a twofold argument that the Agreement here is a nullity because obtained through duress. First, it argues that there was never a meeting of the minds of the union representative and Hillis, because only the signature page of the agreement was presented to Hillis for his signature. Second, it argues coercion by the threat to picket the Hillis Homes construction site.

The testimony regarding how much of the Agreement was presented to Hillis conflicts. The union representative testified that he presented the whole agreement to Hillis, and Hillis testified that only the signature page was presented to him. The union representative's testimony constitutes substantial evidence to support the court's findings that "On the 17th day of June, 1974, the employer and the union signed a labor agreement . . . which was effective

June 1, 1974 through June 1, 1977. . . ." A finding of fact supported by substantial evidence will not be disturbed on appeal. *Local 1296, Int'l Ass'n of Firefighters v. Kennewick,* 86 Wn.2d 156, 542 P.2d 1252 (1975). This contention is therefore without merit.

▪ As for the employer's argument that the union's threat of picketing constituted such duress as to avoid the agreement, the trial court concluded

> The defendants affirmative defense of union coercion and duress is hereby denied . . . because the employer is estopped to deny the binding nature of the agreement and has ratified its terms, by reporting certain of its . . . employees, and paying contributions for them, continuously throughout June, 1974 through August, 1977 period.

Even assuming that the threat of picketing was unlawful, such duress would render the contract voidable, not void, and thereby subject to ratification by the party upon whom the alleged duress was perpetrated. *Lewis v. Kerns,* 175 F. Supp. 115 (S.D. Ind. 1959). By its subsequent conduct, *viz.,* paying the agreed upon contributions for its union employees, Hillis Homes ratified the agreement. *Restaurant Employees, Bartenders & Hotel Serv. Employees Welfare Fund v. Rhodes,* 90 Wn.2d 162, 580 P.2d 611 (1978). The trial court did not err.

## ABANDONMENT

▪ Hillis Homes suggests that because its observance as well as the union's enforcement of the contract was piecemeal, the union should be deemed to have abandoned the contract. *Monroe v. Fetzer,* 56 Wn.2d 39, 350 P.2d 1012 (1960). The record corroborates the trusts' position that this issue was never raised at trial. An issue raised for the first time on appeal will not be addressed. *Pearce v. G.R. Kirk Co.,* 92 Wn.2d 869, 602 P.2d 357 (1979). We, therefore, do not reach this issue.

The respondent has complied with RAP 18.1 by praying for attorneys' fees in his brief, by timely filing the requisite affidavit, and by requesting in oral argument such an

award. The trust agreement provides for an award to the trust of attorneys' fees incurred in suing an employer for delinquent contributions. Therefore, the respondent is awarded attorneys' fees on appeal in the amount of $3,412.50.

The trial court judgment is affirmed.

CALLOW, C.J., and WILLIAMS, J., concur.

Reconsideration denied June 27, 1980.

Review denied by Supreme Court October 10, 1980.