William F. MARTIN, et al., Plaintiffs,

v.

BENESH & BRUNS, INC., a corporation, Defendant.

No. 80 C 1994.

United States District Court, N. D. Illinois, E. D.

Jan. 6, 1982.

Bernard M. Baum, Walter J. Reum, Chicago, Ill., for plaintiffs.

Gerard C. Smetana, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

MARSHALL, District Judge.

In this action, plaintiffs seek to compel defendant Benesh & Bruns, Inc. to make the contributions to various pension and welfare funds of the International Union of Operating Engineers, Local 150, which defendant allegedly contracted to make. Defendant claims it need not honor the contract, since the union in question did not enjoy the support of a majority of defendant's employees.

For the purposes of this motion, the relevant facts are as follows. Defendant was party to a contract between the I.U.O.E., Local 150, and certain employer associations. The contract required the defendant to make contributions to the union's Welfare Fund, Pension Trust Fund, Apprenticeship Fund, and Vacation Savings Fund. Defendant has not made the required contributions. As a result, plaintiffs[1] filed suit to recover the amounts due and owing on the contract. This court has jurisdiction under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) (1976), and § 502(f) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(f) (1976).

■ Defendant moved for summary judgment on the ground, inter alia, that the

---

1. Plaintiffs administer the various funds in their capacities as trustees of the funds.

union did not have the support of a majority of defendant's employees, and therefore could not enforce the contract. In an opinion dated September 22, 1981, this court ruled that the alleged nonmajority status of the union was not a defense to this action.[2] Defendant has moved the court to reconsider its earlier ruling.

■ In suits under § 301, a federal common law of labor relations is applied. *Textile Workers Union v. Lincoln Mills of Alabama*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). This common law is formulated by reference to § 301's ultimate purpose of furthering the goals of national labor policy. *Id.* at 456–57, 77 S.Ct. at 917–18. One of the fundamental goals of national labor policy is protecting the freedom of choice of employees. The National Labor Relations Act is intended to protect the principle that the majority of employees should be free to decide whether they wish to be represented by a union, and, if so, which union will be chosen to provide representation. In order to protect the will of the majority, the Act makes it an unfair labor practice for an employer to sign a labor contract with a nonmajority union. *See International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 737–38, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961). This result is dictated by the "generally prevailing statutory policy that a union should not purport to act as the collective bargaining agent for all unit employees, and may not be recognized as such, unless it is the voice of the majority of the employees in the unit." *NLRB v. Local Union No. 103, International Association of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 344, 98 S.Ct. 651, 657, 54 L.Ed.2d 586 (1978) [hereinafter *Hig-*

*don* ]. *See Connell Construction Co. v. Plumbers & Steamfitters Union, Local 100*, 421 U.S. 616, 632–33, 95 S.Ct. 1830, 1839–40, 44 L.Ed.2d 418 (1975).

However, § 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f) (1976), is an exception to the general rule requiring majority representation. *Higdon*, 434 U.S. at 345, 98 S.Ct. at 657; *Connell*, 421 U.S. at 632, 95 S.Ct. at 1839. Section 8(f) provides:

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employ-

2. However, the court also ruled that the question of majority status would be tried, in order to guard against the possibility of reversal on appeal. In order to avoid confusion as to what evidence will be relevant on this issue, we take this opportunity to make it clear that plaintiffs can demonstrate majority status at trial in only two ways. Plaintiffs can demonstrate either that the union had the support of a majority of defendant's employees, or that a majority of defendant's employees assented to being merged into a multi-employer bargaining unit

in which the union enjoyed majority support. *See Baton Rouge Building & Construction Trades Council v. E. C. Schafer Construction Co.*, 657 F.2d 806, 810–11 (5th Cir. 1981); *NLRB v. Local 210, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers*, 330 F.2d 46, 47 (2d Cir. 1964); *Authorized Air Conditioning Co.*, 236 N.L.R.B. 131, 134–35 (1978), *enforced sub nom. Authorized Air Conditioning Co. v. NLRB*, 606 F.2d 899 (9th Cir. 1979); *Mohawk Business Machines Corp.*, 116 N.L.R.B. 248, 249 (1956).

ment based upon length of service with such employer, in the industry or in the particular geographical area: *Provided,* That nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section [relating to invalid dismissals pursuant to union security clauses]: *Provided further,* That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

The exception created by § 8(f) allows employers and nonmajority unions to sign contracts, which are commonly referred to as "pre-hire agreements." However, the exception is a limited one. In *Higdon,* the Supreme Court held that union picketing aimed at requiring an employer to adhere to a pre-hire contract was an unfair labor practice under § 8(b)(7)(C) of the Act, 29 U.S.C. § 158(b)(7)(C) (1976) (prohibiting picketing where an object thereof is forcing an employer to bargain with or recognize a union). Defendant concedes that the holding of *Higdon* does not reach this case, since *Higdon* was decided under a statute which prohibits certain forms of picketing, and no picketing is present in this case. However,

defendant argues that the free choice rationale of *Higdon* reaches attempts to enforce contracts made with nonmajority unions under § 301. This is a question on which courts have split.[3] It is the view of this court that national labor policy favors the enforcement of pre-hire contracts. Therefore, the motion to reconsider is denied.

■ Our analysis is essentially in two parts. First, in suits to enforce pre-hire agreements, there is present a strong national labor policy favoring enforcement of labor contracts, which was not at issue in *Higdon.* Second, we find that the national labor policy favoring free choice which was at the core of *Higdon* is not present in this case.

■ It is beyond doubt that there is a strong national labor policy favoring the enforcement of labor contracts and the removal of defenses to enforcement. See *Lewis v. Benedict Coal Co.,* 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960); *Textile Workers Union of Lincoln Mills of Alabama,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *Pennington v. United Mine Workers,* 325 F.2d 804, 819 (6th Cir. 1963),

**3.** A number of courts have held that pre-hire agreements are judicially enforceable and that nonmajority status is no defense. *See New Mexico District Council of Carpenters v. Mayhew Co.,* 664 F.2d 215 (10th Cir. 1981); *Contractors, Laborers, Teamsters & Engineers Health & Welfare Fund v. Associated Wrecking Co.,* 638 F.2d 1128 (8th Cir. 1980); *Carpenters Health & Welfare Trust Fund for California v. Dos Reis,* No. S–80–960 (E.D.Cal. Nov. 10, 1981); *Laborers Health & Welfare Trust Fund v. Kirkwood Bly, Inc.,* 91 CCH Lab.Cas. ¶ 12,-882 (N.D.Cal.1981); *Trustees of the Atlanta Iron Workers Local 387 v. Southern Stress Wire Corp.,* 509 F.Supp. 1097 (N.D.Ga.1981); *Eastern District Council of the United Brotherhood of Carpenters and Joiners v. Blake Construction Co.,* 457 F.Supp. 825, 829 (E.D.Va. 1978); *Western Washington Cement Masons Health & Security Trust Funds v. Hillis Homes, Inc.,* 26 Wash.App. 224, 612 P.2d 436 (1980). *See also W. C. James, Inc. v. Oil, Chemical & Atomic Workers International Union,* 646 F.2d 1292, 1294–95 (8th Cir. 1981) (Pre-hire agreements are not prospectively enforceable, but may be enforced for prior periods in which they operated); *NLRB v. Irvin,* 475 F.2d 1265, 1271 (3d Cir. 1973) (Pre-hire agreements containing

union security clauses are enforceable). However, a number of courts have reached the opposite result. *See Baton Route Building & Construction Trades Council v. E. C. Schafer Construction Co.,* 657 F.2d 806 (5th Cir. 1981); *NLRB v. Haberman Construction Co.,* 641 F.2d 351, 364–68 (5th Cir. 1981) (en banc) (dictum); *Chicago District Council of Carpenters Pension Fund v. Sorenson,* No. 80 C 2392 (N.D.Ill. Aug. 24, 1981); *United Mine Workers of America, District 4 v. Otis Elevator Co.,* 491 F.Supp. 496 (W.D.Pa.1980); *Washington Area Carpenters' Welfare Fund v. Overhead Door Co.,* 488 F.Supp. 816 (D.D.C.1980); *Contractors, Laborers, Teamsters & Engineers Health & Welfare Fund v. Associated Wrecking Co.,* 484 F.Supp. 582, 583 (D.Neb.1980), *rev'd,* 638 F.2d 1128 (8th Cir. 1981); *Vermeer v. Aloha Contractors, Inc.,* 107 L.R.R.M. 2895 (D.Ore.1980); *Paddack v. Clark,* 107 L.R.R.M. 2325 (D.Ore.1980); *Western Washington Laborers-Employers Health & Security Trust Fund v. McDowell,* 103 L.R.R.M. 2219 (W.D.Wash.1979). *See also Florida Marble Polishers Health & Welfare Trust Fund v. McGahee,* 102 L.R.R.M. 2740 (M.D.Fla.1979) (Holding pre-hire contracts are enforceable during periods prior to cancellation by the employer, but void after cancellation.).

*rev'd on other grounds,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Trustees of the Atlanta Iron Workers Local 387 Pension Fund v. Southern Stress Wire Corp.,* 509 F.Supp. 1097, 1100–01 (N.D.Ga.1981). Moreover, basic fairness dictates that these contracts should be enforced; employers should not be allowed to break their promises with impunity. *See Contractors, Laborers, Teamsters & Engineers Health & Welfare Fund v. Associated Wrecking Co.,* 638 F.2d 1128, 1134 (8th Cir. 1980) ("An employer who accepts the benefits of such an agreement must also honor the obligations under that agreement").[4] The strength of the national labor policy favoring enforcement of contracts is heightened in this case for two reasons. First, this case involves contributions to various welfare funds, and the national labor policy favoring enforcement of contracts applies "with even greater force to protecting the interests of beneficiaries of the welfare fund, many of whom may be retired, or may be dependent ...." *Lewis v. Benedict Coal Co.,* 361 U.S. at 470, 80 S.Ct. at 496. Second, the policy is especially relevant here because of the risk of unjust enrichment. If the defense of nonmajority status is allowed, defendant will be relieved of having to pay money due and owing to the various pension funds. However, this money is not rightfully the defendant's. Rather, these "payments are really another form of compensation to the employees, and as such the obligation to pay royalty might be thought to be incorporated into the individual employment contracts." Id. at 469, 80 S.Ct. at 495, *see Huge v. Long's Hauling Co.,* 590 F.2d 457, 464–65 (3d Cir. 1978) (Adams, J., concurring); *Lewis v. Seanor Coal Co.,* 382 F.2d 437, 441 (3d Cir. 1967),

*cert. denied,* 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137 (1968). Defendant's obligation was really to its individual employees, who were the ultimate beneficiaries of the contract, and it is unfair that they should lose past compensation due and owing because of the union's status.

*Higdon* simply did not involve these considerations. There, the Court was addressing the question of whether picketing to enforce a pre-hire agreement by a minority union was the sort of coercion forbidden by § 8(b)(7)(C). The national labor policy favoring enforcement of contracts was not at issue, because *Higdon* was not an enforcement action. *Higdon* was a case about picketing, which Congress has specifically labelled as unduly coercive in § 8(b)(7)(C). *Higdon* was decided in a context very different from the context of this case. *See Associated Wrecking,* 638 F.2d at 1132–33; *Southern Stress,* 509 F.Supp. at 1103–04; *Eastern District Council of the United Brotherhood of Carpenters & Joiners of America v. Blake Construction Co.,* 457 F.Supp. 825, 829 (E.D.Va.1978).[5] Defendant relies on *Higdon's* statement that "[t]he employer's duty to bargain and to honor the contract is contingent on the union's attaining majority support at the various construction sites," 434 U.S. at 345, 98 S.Ct. at 657, and that prior to that point the agreement is "voidable and does not have the same stature as a collective bargaining contract entered into with a union actually representing a majority of the employees ...." *Id.* at 341, 98 S.Ct. at 655. However, defendant ignores the context in which this language appears. The Court's holding was that the pre-hire agreement

---

4. Congress recognized that the benefits employers receive from pre-hire agreements are considerable. *See* Sen. Report No. 187, 86th Cong., 1st Sess. 55–56 (1959), U.S.Code Cong. & Admin.News 1959, p. 2318, *reprinted in* 1 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 451–52 (1959) [hereinafter cited as Legislative History]; House Rep. No. 741, 86th Cong., 1st Sess. 19–20 (1959), reprinted in 1 Legislative History 777–78.

5. Because of *Higdon's* context as an unfair labor practice action, defendant's reliance on it is perilous for another reason as well. Because *Higdon* was a review of an NLRB order, the Court was required to pay substantial deference to the views of the Board, *see* 434 U.S. at 350, 98 S.Ct. at 660, which considers pre-hire contracts unenforceable, *see* Dee Cee Floor Covering, Inc., 232 N.L.R.B. 421, 422 (1977); Ruttman Construction Co., 191 N.L.R.B. 701, 702 (1971); *but see* Oilfield Maintenance Co., 142 N.L.R.B. 1384 (1963).

was "voidable" only for purposes of the National Labor Relations Act.

It does not necessarily follow, however, that the absence of majority status leaves the union without a remedy for breach of contract on any provision of the section 8(f) agreement. To say that an employer may challenge the majority status of a union in an unfair labor practice proceeding is not to say that the employer may assert the union's lack of majority status as a defense in a breach of contract action on a type of contract specifically authorized by the act. *Associated Wrecking*, 638 F.2d at 1133.

In fact, the *Higdon* Court itself termed pre-hire agreements "comparable" to hot-cargo clauses, which are unenforceable for purposes of the NLRA, but which can be enforced in a breach of contract action under § 301. *See id.* at 349 n. 11, 98 S.Ct. at 659 n. 11.[6] Moreover, the Court has specifically held that the § 301's definition of "contracts" which can be sued on under its provisions is broader than the term "collective bargaining contract" which is enforceable for the purposes of the NLRA. *Retail Clerks v. Lion Dry Goods, Inc.*, 369 U.S. 17, 25, 82 S.Ct. 541, 546, 7 L.Ed.2d 503 (1962). Thus, there is no reason to assume that what is considered an invalid contract for one act should also be considered invalid under the other.

In short, the context of *Higdon* is much different than that of the instant case. *Higdon* arose in the context of picketing under the NLRA, a practice which Congress felt was especially coercive. *See* 434 U.S. at 346–48, 98 S.Ct. at 658–59. This case arises under § 301. Here, the special concern with picketing is not present; instead a set of policies favoring the enforcement of contracts free of defenses operates. The different mix of national labor policies requires a different result than that reached in *Higdon*.

Although the mix of policies present in this case substantially differs from that present in *Higdon*, that observation should not end the analysis. The essence of defendant's position is not merely sterile reliance on *Higdon*, it is the contention that enforcement of a contract with a nonmajority union poses the sort of threat to employee free choice that national labor policy strongly condemns. One court put it this way:

If the goal is the maintenance of *employee* free choice, it matters not whether the sword dangling above the employer's head is an unfair labor practice charge or a breach of contract suit. The direction of the pressure is the same—toward treatment of a nonmajority union as the employee's agent for collective bargaining. *Baton Rouge Building & Trades*

6. The closest that the Court came to holding pre-hire agreements unenforceable under § 301 was when it stated,

The union argues that the Board's position permitting an employer to repudiate a pre-hire agreement until the union attains majority support renders the contract for all practical purposes unenforceable, assertedly contrary to this Court's decision in *Retail Clerks v. Lion Dry Goods, Inc.*, 369 U.S. 17 [82 S.Ct. 541, 7 L.Ed.2d 503] (1962). There, the Court's opinion recognized that § 301 of the Labor Management Relations Act confers jurisdiction on the federal courts to entertain suits on contracts between an employer and a minority union, as well as those with majority-designated collective-bargaining agents. Section 8(f) contracts were noted as being in this category. The Court was nevertheless speaking to an issue of jurisdiction. That a court has jurisdiction to consider a suit on a particular contract does not suggest

that the contract is enforceable. It would not be inconsistent with *Lion Dry Goods* for a court to hold that the union's majority standing is subject to litigation in a § 301 suit to enforce an 8(f) contract, just as it is in a § 8(a)(5) unfair labor practice proceeding, and that absent a showing that the union is the majority's chosen instrument, the contract is unenforceable. 434 U.S. at 351–52, 98 S.Ct. at 660–61.

Even reading this passage for all that it is worth, there is no way to characterize it as anything but dictum; *Higdon* did not involve a § 301 suit. Moreover, the Court was careful not to decide the § 301 question; it merely reserved it. The opinion states simply that "it would not be inconsistent" with *Lion Dry Goods* to hold a pre-hire agreement with a minority union unenforceable under § 301. The Court did not say that it would so hold; but simply that *Lion Dry Goods* did not dictate the opposite result.

*Council v. E. C. Schafer Construction Co.*, 657 F.2d 806, 813 (5th Cir. 1981).

If the *Baton Rouge* court's assessment of pre-hire contracts with nonmajority unions were correct, then this court might hold such contracts unenforceable, despite the differences between this case and *Higdon*. National labor policy strongly favors allowing the majority of employees to decide for themselves whether or not they favor representation by a given union. *See Chicago District Council of Carpenters Pension Fund v. Sorenson*, No. 80 C 2392, slip op. at 6–7 (N.D.Ill. Aug. 24, 1981). However, enforcement of a pre-hire agreement does not present the threat to employee free choice which national labor policy condemns.

First, the absence of any recognitional objective means that the normal policies against employer dealings with non-majority unions are not present. The danger posed by contracts between employers and non-majority unions is not that an employer is observing his contract with a minority union, since § 8(f) permits that. Rather it is the threat of "top-down" organizing; that an outside union will use its rights under such a contract to harass employees into joining that union. *See* 434 U.S. at 346–49, 98 S.Ct. at 658–59; *International Union of Operating Engineers, Local 150*, 255 N.L.R.B. No. 83 (1981). However, as noted above, this harassment is the result of picketing, and not the result of breach of contract suits. *See Associated Wrecking*, 638 F.2d at 1133–34; House Rep. No. 741, 86th Cong., 1st Sess. 23–24 (1959), *reprinted in* 1 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 781–82 (1959) [hereinafter cited as Legislative History]. We fail to see how a breach of contract action poses the same threat to employee free choice that picketing does. The contract inures to the benefit of the individual employees, not the union. Congress recognized this point in the area of hot cargo clauses, which it concluded were not so coercive as to be unenforcea-ble in a breach of contract action, but which become unduly coercive only when they give rise to picketing. *See* NLRA § 8(e), 29 U.S.C. § 158(e) (1976); *Donald Schriver, Inc. v. NLRB*, 635 F.2d 859, 876 (D.C.Cir. 1980); *Western Washington Cement Masons Health & Security Trust Funds v. Hills Homes, Inc.* 26 Wash.App. 224, 612 P.2d 436 (1980). Congress has always been especially concerned with picketing, *see* 434 U.S. at 346–48, 98 S.Ct. at 658–59, here, there is only a breach of contract action. Employees are not pressured to join the union; they receive the same benefits under the contract whether or not they are union members. Therefore, the threat to employees' rights not to join a given union, or any union at all, is simply not present in this case. To the extent that employees are encouraged to join the contracting union, it is not the result of coercion, but simply because they are pleased with the benefits that the union has obtained for them under the contract. Enforcing this contract under § 301 poses no significant risk to employee free choice. *See Carpenters Health & Welfare Trust Fund for California v. Dos Reis*, No. S–80–960 (E.D.Cal. Nov. 10, 1981).[7]

Second, the final proviso to § 8(f) protects employee free choice in this case. That clause allows employees to petition the NLRB for a certification election at any time after the signing of a pre-hire agreement. Because dissatisfied employees have resort to this mechanism, pre-hire agreements pose no threat to their freedom to reject the contracting union. *See Local No. 150, International Union of Operating Engineers v. NLRB*, 480 F.2d 1186, 1189–91 (D.C.Cir.1973); *Oilfield Maintenance Co.*, 142 N.L.R.B. 1384, 1387 n. 10 (1963).

Finally, it is entirely possible that the result defendant wishes this court to reach would pose a greater threat to employee free choice than would the result we do reach. If pre-hire agreements were held unenforceable unless the contracting union attains majority support, the union might

---

7. *See generally International Union of Operating Engineers, Local 150*, 255 N.L.R.B. No. 83 (1981) (Picketing to enforce a pre-hire agree-ment by a nonmajority union where there is no recognitional objective does not violate § 8(b)(7).).

be able to threaten employees with possible loss of the contractual pension and welfare entitlements unless they support the union. This could prove to be a powerful barrier to employee free choice, and could provide a minority union a powerful weapon with which to conduct "top-down" organizing.

In sum, enforcement of the pre-hire agreements under § 301 poses no significant threat to employee free choice. National labor policy does not support defendant's position.

Before concluding this memorandum, the court notes that thus far it has made little reference to the legislative history of § 8(f). This is because there is little of aid in that history; Congress seems not to have given the question presented in this case much thought when it enacted § 8(f). However, to the extent that there is relevant evidence of legislative intent, it supports this court's holding.

First, Congress clearly recognized, when enacting § 8(f), that it was not feasible for unions in the construction industry to demonstrate majority support, because of the short duration of employment in that sector of the economy. *See* Sen.Rep.No. 187, 86th Cong., 1st Sess. 55–56 (1959), *reprinted in* 1 Legislative History 451–52; House Rep.No. 741, 86th Cong., 1st Sess. 19–20 (1959), *reprinted in* 1 Legislative History 777–78. It is hardly reasonable to suppose Congress intended unions to be required to make a showing in suits to enforce § 8(f) contracts which it considered nearly impossible to make when enacting that section.[8]

Second, the structure of the Act indicates that Congress did not intend to make pre-hire agreements unenforceable. When Congress wished to limit the ability of non-majority unions to engage in "top-down" organizing, it did so explicitly, as in § 8(b)(7)'s prohibition on recognitional picketing, or § 8(b)(4)'s ban on secondary action by labor unions. Defendant's position, at bottom, is that these sections did not go far enough in dealing with the problem of "top-down" organizing. However, that is an argument which must be addressed to Congress, and not this court. *See Donald Schriver, Inc. v. NLRB*, 635 F.2d 859, 876 (D.C.Cir.1980).

Third, the Senate's version of the 1959 Amendments[9] to the NLRA, which added §§ 8(e) and 8(f) to the NLRA, contained a clause in what became § 8(e) which made hot cargo agreements not only unfair labor practices, but unenforceable under § 301. See S. 1555, § 707(c), 86th Cong., 1st Sess. (1959), *reprinted in* 1 Legislative History 583. Section 8(f) contained no similar provision.[10] This absence of an unenforceability clause therefore creates a strong inference that the draftsmen of the Act intended § 8(f), unlike § 8(e), to give rise to enforceable contracts under § 301.

Finally, in its recent amendments to the ERISA statute, Congress has strongly indicated that it intends pre-hire contracts are enforceable without regard to a union's majority status. While amending the Act, Congress added 29 U.S.C. § 1145 (Supp. IV 1980):

*Delinquent Contributions.* Every employer who is obligated to make contributions to a multi-employer plan under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan and agreement.

Defendant is an employer covered by the terms of the statute. While the statutory language is ambiguous as to whether a union's nonmajority status is a defense, the

---

**8.** Moreover, Congress likely would have recognized that requiring this showing under § 301 would make for burdensome litigation and creates a possibility of judicial conflict with the NLRB, since courts might reach a different conclusion as to a union's majority status than would the Board. *See Lion Dry Goods*, 369 U.S. at 29, 82 S.Ct. at 548.

**9.** The 1959 Amendments originated in and were first drafted by the Senate.

**10.** The unenforceability clause of § 8(e) was deleted by the Conference Committee. *See* House Conf.Rep.No. 1147, 86th Cong., 1st Sess. 39–40 (1959), *reprinted in* 1 Legislative History 943–44.

sponsors of the legislation made it clear that they did not intend nonmajority status to be a defense.

Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly. Some simple collection actions brought by Plan trustees have been converted into lengthy, costly, and complex litigation concerning claims and defenses unrelated to the employer's promise and the Plan's entitlement to the contributions. This should not be the case. Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law (other than 29 U.S.C. § 186). Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises.

In this regard we endorse judicial decisions such as *Lewis v. Benedict Coal Corp.; Lewis v. Mills Ridge Coals Inc.;* and *Huge v. Longs Hauling Co., Inc..* Cases such as *Western Washington Laborers Employers Health and Security Trust Fund v. McDowell,* and *Washington Area Carpenters Welfare Fund, et al. v. Overhead Door Co.,* are considered to have been incorrectly decided, and this legislation is intended to clarify the law in this respect by providing a direct, unambiguous ERISA cause of action to a plan against a delinquent employer. 126 Cong.Rec.S. 11673 (daily ed. Aug. 26, 1980) (remarks of Sen. Williams); 126 Cong.Rec.H. 7899 (daily ed. Aug. 26, 1980) (remarks of Rep. Thompson) (citations omitted).

The ERISA amendments are strong evidence that Congress does not intend pre-hire agreements to be unenforceable absent the union's demonstration of majority status.[11]

In sum, neither the holding nor the rationale of *Higdon* indicates that the result this court reached in its earlier opinion was incorrect.[12] National labor policy favors the enforcement of pre-hire contracts without regard to the majority status of a union. The motion to reconsider is denied.

---

11. However, it must be admitted that reliance on the 1980 ERISA amendments is perilous, since there were no committee reports on this issue, and since the quoted speeches were not actually read on the floor of either House.

12. In its earlier opinion, the court relied, as it does in this opinion, on the Eighth Circuit's opinion in *Associated Wrecking.* Defendant contends that this reliance is misplaced in light of *W. C. James, Inc. v. Oil, Chemical & Atomic Workers International Union,* 646 F.2d 1292 (8th Cir. 1981), where the court apparently limited *Associated Wrecking* to retrospective enforcement of pre-hire agreements, and held that an employer is free to prospectively cancel an agreement. *W. C. James* is admittedly a puzzling case. It states its "holding" in entirely conclusory fashion, making no attempt to examine the underlying rationale of *Associated Wrecking.* To the extent *W. C. James* is inconsistent with *Associated Wrecking,* we decline to follow it. However, since this case seeks "retrospective" enforcement, our holding is in no way inconsistent with *W. C. James.* Moreover, since it appears that the parties in *W. C. James* never consummated a pre-hire agreement, the entire discussion of this question in that case may be dictum. *See* 646 F.2d at 1295; *id.* at 1296 (Bright, J., concurring).