542 F.Supp. 634 (1982)
CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION FUND, Chicago District Council of Carpenters Welfare Fund, Chicago District Council of Carpenters Apprentice & Trainee Program and the Chicago District Council of Carpenters, George Vest, Jr., Wesley Isaacson, Milton Holzman, Thomas E. Ryan, Richard S. Pepper, Albert Kaufman, Dominic J. Velo and Herbert S. Church, Jr., as Trustees of the Chicago District Council of Carpenters Pension and Welfare Funds, Richard S. Pepper, Wesley Isaacson, George Vest, Jr., Thomas D. Coleman, Jack Bornhoeft, Dominic J. Velo, Edward Ellis and Kenneth Borg, as Trustees of the Chicago District Council of Carpenters Apprentice & Trainee Program, Plaintiffs,
v.
Allyn H. SKREDE, Individually and d/b/a Ability Cabinet Company, Defendants.
No. 81 C 4189.
United States District Court, N. D. Illinois, E. D.
June 14, 1982.
*635 Collins P. Whitfield, Hugh J. McCarthy & Associates, Ltd., Chicago, Ill., for plaintiffs.
Edward V. Hanrahan, Chicago, Ill., for defendants.

MEMORANDUM OPINION AND ORDER
ASPEN, District Judge:
Plaintiff, Chicago District Council of Carpenters Pension Fund (the "Fund"), brought this action against defendants Allyn H. Skrede and Ability Cabinet Company to collect $14,697.83 in fringe benefit contributions allegedly due to the Fund from defendants pursuant to the terms of a collective bargaining agreement and certain trust agreements.[1] Jurisdiction is premised upon § 502 of the Employee Retirement Income Security Act, 29 U.S.C. § 1132 (1976). Presently before the Court are the parties' cross-motions for summary judgment[2] on the sole legal issue whether the Fund can enforce a "pre-hire" agreement which requires defendants to make fringe benefit contributions to the Carpenters' Pension and Welfare Funds and the Carpenters' Apprentice and Trainee Program on behalf of all employees, union and non-union, doing work within the occupational scope of the collective bargaining agreement. For the following reasons, the Fund's motion is granted and the defendants' motion is denied.
The circumstances underlying this lawsuit are not in dispute. On October 2, 1975, the parties executed a contract which purported to bind the defendants to the terms and conditions of the collective bargaining and trust agreements negotiated between the Chicago District Council of Carpenters and the Mid-America Regional Bargaining Association. Those agreements required that employers contribute a specific sum to the Fund for each hour union and non-union employees performed work within the occupational scope of the collective bargaining agreement. Between October 1, 1978, and March 31, 1980, however, defendants made contributions on behalf of only one of five employees performing work within the occupational scope of the collective bargaining agreement. The four employees on whose behalf defendants refused to make fringe benefit contributions were not union *636 members. Upon discovery of defendants' apparent delinquency, the Fund brought this action to collect the fringe benefit contributions allegedly due.
Defendants contend that the "pre-hire" agreement which required them to make contributions to the Fund on behalf of non-union employees is not enforceable.[3] Defendants argue that compliance with the terms of a pre-hire agreement is voluntary until the union achieves majority status among the employer's workers within the bargaining unit. Cf. N.L.R.B. v. Iron Workers Local 103, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978) ("Higdon"). The Fund argues, on the other hand, that defendants are liable for their failure to make fringe benefit contributions whether the union achieved majority status or not. Federal courts which have considered the enforceability of pre-hire agreements in this context have split.[4]
In Higdon, the Supreme Court upheld the NLRB's conclusion that it was an unfair labor practice for an uncertified majority union to engage in extended picketing as a device to enforce a pre-hire agreement.[5] 434 U.S. at 341, 98 S.Ct. at 655. The Court reasoned that although the National Labor Relations Act permitted labor and management to enter into pre-hire agreements, the use of picketing to enforce those agreements would hinder employees' freedom to make an uncoerced choice of bargaining agent.[6]Id. at 346, 98 S.Ct. at 658. Defendants' effort to apply the same reasoning to the Fund's attempt to collect fringe benefit contributions in this case is not persuasive. As the Eighth Circuit noted in Associated Wrecking Co., supra:
[Higdon] held that an employer does not commit an unfair labor practice for breach of its duty to bargain by unilaterally abrogating a pre-hire agreement with a labor union that never obtains majority support from the employees in the bargaining unit. It does not necessarily follow, however, that absence of majority status leaves the union without a remedy for breach of contract on any provision of the section 8(f) agreement. *637 To say that an employer may challenge the majority status of a union in an unfair labor practice proceeding is not to say that the employer may assert the union's lack of majority status as a defense in a breach of contract action on a type of contract specifically authorized by the Act.
638 F.2d at 1133.
We do not agree with defendant's argument that the distinction between the unfair labor practice context of Higdon and the breach of contract context of this case is without significance. Despite the broad language of the decision, the Supreme Court's specific holding in Higdon is directed against those tactics used to enforce pre-hire agreements which also constitute unfair labor practices under § 8 of the National Labor Relations Act. 29 U.S.C. § 158 (1976). In the present case, although defendants argue generally that the entire pre-hire agreement undermines the policy of the Act, they have not and could not allege that a breach of contract action to enforce the collection of fringe benefit contributions on behalf of non-union employees is an unfair labor practice. Defendants' reading of Higdon would require us to hold all pre-hire agreements unenforceable until majority status is established, whether or not the means employed to achieve such enforcement was otherwise lawful. This result is not supported by Higdon.[7]See Trustees of the Atlanta Iron Workers Local 387 Pension Fund v. Southern Stress Wire Corp., 509 F.Supp. 1097, 1103-04 (N.D.Ga. 1981).
Defendants' contention that the entire pre-hire agreement interferes with their employees' freedom to choose a bargaining agent, as guaranteed by the National Labor Relations Act, obscures the fundamental policy issue raised by this case. We are not concerned with the propriety of the agreement itself; Congress has expressly declared that a pre-hire agreement is not an unfair labor practice under the Act.[8] 29 U.S.C. § 158(f). Rather, the extent to which a pre-hire agreement interferes with the policy of guaranteeing employees' freedom to choose a bargaining agent is measured with reference to the means chosen to enforce the agreement. Defendants have not, however, demonstrated how the collection of fringe benefit contributions on behalf of non-union employees interferes with those employees' freedom of choice.
The pre-hire agreement has allowed defendants to enjoy the benefits of knowing their labor costs and being able to project those costs accurately. N.L.R.B. v. Irvin, supra, 475 F.2d at 1267. The agreement has also helped to guarantee industrial peace at defendants' worksites during the period involved in this case. Associated Wrecking, supra, 638 F.2d at 1134. See generally Sen.Rpt.No. 187, 86th Cong., 1st *638 Sess. 55-56 (1959); House Rep.No. 741, 86th Cong., 1st Sess. 19-20 (1959), U.S.Code Cong. & Admin.News, p. 2318. After having enjoyed the benefits of the pre-hire agreement at issue, defendants cannot now avoid their reciprocal obligation to contribute to the Fund simply by asserting that the agreement is wholly unenforceable. In light of the policies underlying the National Labor Relations Act, the Court will not strain to read Higdon in a way which permits an employer to accept the benefits of a pre-hire agreement without having to honor its obligations under that agreement.
Even if the broad language of Higdon is separated from its factual context, the Supreme Court's decision does not support defendants' motion for summary judgment. The Higdon Court expressly declared that until the union achieves majority status, "the pre-hire agreement is voidable and does not have the same stature as a collective bargaining contract...." Higdon, supra, 434 U.S. at 341, 98 S.Ct. at 655. The Court did not decide that such an agreement was void. Reading Higdon as broadly as its language allows, a pre-hire agreement would become unenforceable only upon the employer's affirmative repudiation of the agreement. Todd, supra, 667 F.2d at 803; Atlanta Iron Workers, supra, 509 F.Supp. at 1105. Defendants' simple failure to perform its contractual obligation to contribute to the Fund without some affirmative notice to the Fund is not itself sufficient to constitute such a repudiation. Todd, supra, 667 F.2d at 804. The Fund was never put on notice by the defendants that it was no longer responsible for covering the employees for whom contributions were not received. Cf. Florida Marble Polishers Health and Welfare Trust Fund v. Megahee, 102 L.R.R.M. 2740 (1979).
The Fund's motion for partial summary judgment also seeks recovery of attorneys' fees, costs and interest on the delinquent contributions pursuant to the collective bargaining agreement and 29 U.S.C. § 1132(g)(2) (1980). In this context, the Fund is entitled to such an award regardless of defendants' good faith. Accordingly, the Fund's motion for partial summary judgment is granted and defendants' motion is denied. The Fund is directed to submit to this Court for approval a statement detailing the appropriate amount of interest on this judgment as provided in the Act and the reasonable attorneys' fees and costs attributable to this lawsuit. It is so ordered.
NOTES
[1] The Fund also seeks recovery of attorneys' fees, costs and interest on the amount due pursuant to 29 U.S.C. § 1132(g)(2) (1976).
[2] The Fund has moved for partial summary judgment for recovery of all amounts due and owing as well as costs, attorneys' fees and interest. The Fund's motion is not directed to that part of the prayer for relief which requests that defendants be ordered to perform and continue to perform all obligations it has undertaken under the agreement at issue. We do not decide, therefore, whether a pre-hire agreement can be enforced prospectively. Cf. W. C. James, Inc. v. Oil, Chemical and Atomic Workers International Union, 646 F.2d 1292, 1295 (8th Cir. 1981).
[3] A "pre-hire" agreement is a type of contract unique to the construction industry which permits employees and unions to enter into a labor agreement before all of the employees have been hired and before the union's membership encompasses a majority of the employees. Although it is generally an unfair labor practice for a union to bargain and reach agreement with management prior to demonstrating majority support, the National Labor Relations Act permits such an agreement in the construction industry. 29 U.S.C. § 158(f). See N.L. R.B. v. Irvin, 475 F.2d 1265, 1267 (3d Cir. 1973).
[4] A number of courts have concluded that prehire agreements are enforceable and that the union's non-majority status is no defense. See e.g., New Mexico District Council of Carpenters v. Mayhew Co., 664 F.2d 215 (10th Cir. 1981); Contractors, Laborers, Teamsters & Engineers Health & Welfare Fund v. Associated Wrecking Co., 638 F.2d 1128 (8th Cir. 1981); Martin v. Bruns, 532 F.Supp. 408 (N.D.Ill.1982); Eastern District Council of Carpenters v. Blake Construction Co., 457 F.Supp. 825 (E.D.Va. 1978).

Other courts have held that a pre-hire agreement is not enforceable until the union affirmatively demonstrates majority status. See e.g., Baton Rouge Building and Construction Trades Council v. E. C. Schafer Construction Co., 657 F.2d 806 (5th Cir. 1981); Chicago District Council of Carpenters Pension Fund v. Sorenson, No. 80 C 2392 (N.D.Ill. August 24, 1981); Washington Area Carpenters' Welfare Fund v. Overhead Door Co., 488 F.Supp. 816 (D.D.C. 1980); Vermeer v. Aloha Contractors, Inc., 107 L.R.R.M. 2895 (D.Ore.1980).
The Ninth Circuit has held that a pre-hire agreement is fully enforceable until the employer affirmatively repudiates the agreement. See Todd v. McNeff, Inc., 667 F.2d 800 (9th Cir. 1982).
[5] The Supreme Court in Higdon deferred to the NLRB's factual finding that the object of the union's picketing was to obtain recognition of the union as the worker's sole bargaining agent as well as to enforce the pre-hire agreement itself. 434 U.S. at 341 n.7, 98 S.Ct. at 656 n.7. There is no comparable NLRB finding in this case.
[6] Congress' intent to prevent such coercion is evidenced by § 8(b)(7) of the National Labor Relations Act which makes it an unlawful labor practice to picket an employer with the object of forcing the employer to recognize or bargain with a particular labor union. 29 U.S.C. § 158(b)(7) (1976). The National Labor Relations Act does not evidence a comparable concern over the coercive effect of collecting fringe benefit contributions on behalf of non-union employees.
[7] Indeed, Higdon itself notes that pre-hire agreements are "comparable" to "hot-cargo" clauses, which are not enforceable by picketing but can be enforced in a breach of contract action brought under § 301. Higdon, supra, 434 U.S. at 349, n.11, 98 S.Ct. at 659-60 n.11. See also Martin, supra at 413.
[8] 29 U.S.C. § 158(f) provides in part:

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization or opportunities for employment with such employer or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area.